CHARLIE H. and Nadine H., et al., Plaintiffs,

v.

Christine Todd WHITMAN, et al., Defendants.

No. Civ.A.99–3678(GEB).

United States District Court, D. New Jersey.

Jan. 27, 2000.

David L. Harris, Jeffrey B. Gracer, Carmela Cannistraci, Lowenstein Sandler, PC, Roseland, New Jersey, Marcia Robinson Lowry, Susan Lambiase, Eric E. Thompson, Shirim Nothenberg, Children's Rights, Inc., New York City, for plaintiffs, Charlie and Nadine H., et al.

John J. Farmer, Attorney General of New Jersey, Stefanie A. Brand, Deputy Attorney General, Office of New Jersey Attorney General, Newark, New Jersey, Alan C. Kessler, Dana B. Klinges, Charles M. Hart, Wolf, Block, Schorr and Solis–Cohen LLP, Camden, New Jersey, for defendants, Christine Todd Whitman, et al.

## OPINION

BROWN, District Judge.

Table of Contents

I. Introduction ................................................. 480

II. Factual Background and Procedural History ........................... 480

III. Discussion ................................................. 481

 A. Motion to Dismiss Standard ...................................... 481

 B. Defendants' Motion to Dismiss................................... 481

 1. Plaintiffs' Federal Statutory Claims........................... 481
 a. Adoption Assistance Act and MPA ........................... 482
 i. Adoption Assistance Act ................................. 482
 1. right to pre-placement preventive services program ..... 484
 2. right to timely written case plans ..................... 485
 3. right to placement in the least restrictive, most family-like setting ........................................ 489
 4. right to nationally recommended professional standards 490
 5. right to adequate information system.................. 492
 ii. MPA ................................................. 493
 b. Child Abuse Prevention and Treatment Act .................... 496
 c. EPSDT ................................................. 497
 d. ADA and RHA ........................................... 499

 2. Plaintiffs' Federal Common Law Claim.......................... 502

 3. Plaintiffs' Federal Constitutional Claims........................ 504
 a. Substantive Due Process ................................... 504
 i. non-custodial children ................................. 505
 ii. custodial children ..................................... 506
 b. Procedural Due Process ................................... 508
 c. First and Ninth Amendments .............................. 512

 4. Abstention ................................................. 514

IV. Conclusion............................................................ 514

## I. *Introduction*

This matter is before the Court upon the motion of Defendants, Christine Todd Whitman, as Governor of the State of New Jersey, Michele K. Guhl, as Commissioner of the Department of Human Services (hereinafter "DHS"), and Charles Venti, as Director of the Division of Youth and Family Services (hereinafter "DYFS") of the State of New Jersey (hereinafter "Defendants"), to dismiss Plaintiffs' complaint for declaratory and injunctive relief (hereinafter "Complaint" or "Compl.") for failure to state a claim upon which relief can be granted (hereinafter "Def. Motion").[1] For the reasons set forth herein, the Defendants' motion to dismiss is granted with respect to the Second, Third, Fourth, Fifth, Sixth, Eighth, and Ninth Counts of Plaintiffs' Complaint. Moreover, Defendants' motion to dismiss is granted in part and denied in part as discussed more fully herein with respect to the First and Seventh Counts of Plaintiffs' Complaint.

## II. *Factual Background and Procedural History*

There is no term other than tragic to summarize the facts as alleged by Plaintiffs. The Complaint discusses twenty named Plaintiffs: Charlie and Nadine H., siblings aged eleven and nine who have been in DYFS custody for over five years; Jason, Jennifer, and Patti W., siblings aged ten, eight, and six who were removed from their mother's custody three years ago; Dennis M. and Denise R., siblings aged eight and seven who were removed from their mother's custody in 1995; Marco and Juan C., siblings aged eight and ten who were removed from their mother's care for the second time in 1995; Ricardo O., age thirteen-and-a-half who has been in DYFS custody since June 1997; Dolores and Anna G., siblings aged four and seven-

teen months who have been in DYFS custody since August 1998; Kyle J., age one-and-a-half who has been in foster care since birth; Ryan, Christopher, and Melissa H., siblings who currently live with their mother despite numerous reports of abuse and neglect; Ricky, Daniel, and Thomas M., siblings who currently live with their mother, but have spent most their lives in DYFS custody; and Barry M., age seventeen who has been in and out of DYFS custody since the age of four (hereinafter "Plaintiffs"). Compl. at ¶¶ 1, 3, 5, 7, 9, 11, 13, 15, 17, and 19. Moreover, the Complaint also seeks to maintain a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of approximately 9,250 children who are in the legal and/or physical custody of DYFS and on behalf of more than 50,000 children who currently have open DYFS cases for services. *Id.* at ¶¶ 34–36.

Generally speaking, Plaintiffs allege systemic failure on Defendants' part to protect both the individual Plaintiffs and the purported class and to provide them and their families with services which failure has jeopardized their health and safety by subjecting them to significant harm. *Id.* at ¶ 27. Plaintiffs attribute this systemic failure on Defendants' part to poor management and gross overburdening of the child welfare system in New Jersey. *Id.* at ¶ 28. Moreover, Plaintiffs generally allege that Defendants have failed to provide effective leadership or the resources and support necessary to ensure that the child welfare system provides adequate protection and services to New Jersey's most vulnerable children. *Id.* at ¶ 31. Plaintiffs also allege that this failure in leadership and resources has, in turn, led to high turnover rates for front-line caseworkers, which further jeopardizes New Jersey's

---

1. In opposition to Defendants' motion to dismiss, Plaintiffs submitted "Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss" (hereinafter "Pl.Opp."). In response to Plain- tiffs' opposition, Defendants submitted a "Reply Brief in Support of Defendants' Motion to Dismiss" (hereinafter "Def. Reply").

children. *Id.* Finally, Plaintiffs allege that while Defendants are well-aware of the institutional shortcomings, as documented in a 1998 report submitted to Governor Whitman by a Blue Ribbon panel of social service administrators and service providers, lawyers and court personnel, children's advocates, and medical experts, they have failed to engage in aggressive reform efforts. *Id.* at ¶¶ 31 and 32. *See also* Compl. at ¶¶ 205–400.

More specifically, the Complaint explores the circumstances surrounding Plaintiffs' interaction with DYFS and DHS in heart-wrenching detail. For example, the Complaint alleges instances in which Plaintiffs were sexually, physically, and psychologically abused, and in at least one instance, nearly killed, while in DYFS custody. *See, e.g.* Compl. at ¶¶ 84, 85, 108, 127, 134, and 74. Moreover, the Complaint alleges instances in which the Plaintiffs have not received medical treatment while in DYFS custody. *Id.* at ¶¶ 93 and 132. Finally, the Complaint alleges instances in which the Plaintiffs' special needs have not been addressed while in DYFS custody. *Id.* at ¶¶ 105, 107, 122, 131, 139, and 180.

Given all of these alleged institutional deficiencies, Plaintiff seek: i) to be allowed to maintain a class action pursuant to Federal Rule of Civil Procedure 23; ii) a declaration that Defendants' actions and inactions are unconstitutional and unlawful; iii) a permanent injunction requiring Defendants' to cease practices that violate Plaintiffs' rights; iv) appropriate remedial relief to ensure Defendants' future compliance with legally mandated services to Plaintiffs; v) appointment of an expert panel with full access to Defendants, their records and their personnel, to develop and oversee the implementation of a plan for reform; vi) an award of reasonable attorneys' fees; and vii) other equitable relief. *See* Compl. at pp. 129–130. In response, Defendants have moved to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

### III. *Discussion*

#### A. *Motion to Dismiss Standard*

█ A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all allegations in the complaint as true and viewing them in the light most favorable to a plaintiff, the plaintiff is not entitled to relief. *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986). The Plaintiffs' nine causes of action may not be dismissed unless Plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Importantly, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

#### B. *Defendants' Motion to Dismiss*

#### 1. **Plaintiffs' Federal Statutory Claims**

Plaintiffs allege five causes of action pursuant to various federal statutes. Specifically, Plaintiffs allege that they are being deprived of the rights conferred upon them by the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 (hereinafter "AACWA" or "Adoption Assistance Act") and the federal Multiethnic Placement Act of 1994, as amended by the Interethnic Adoption Provisions of 1996 (hereinafter "MPA"). *See* Compl. at Fourth Count and Seventh Count. Plaintiffs also allege that they are being deprived of the rights conferred upon them by the federal Child Abuse Prevention and Treatment Act (hereinafter "CAPTA"). *Id.* at Fifth Count. Plaintiffs also allege violations of the federal Early and Periodic

Screening, Diagnostic and Treatment provisions of the of the federal Medicaid Act (hereinafter "EPSDT"). *Id.* at Eighth Count. Finally, Plaintiffs allege that they are being deprived of rights conferred upon them by the federal Americans with Disabilities Act (hereinafter "ADA") and the Rehabilitation Act of 1973 (hereinafter "RHA"). *Id.* at Ninth Count.

 Plaintiffs' statutory claims are brought pursuant to 42 United States Code § 1983 which imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Section 1983 safeguards certain rights conferred by federal statutes. *Id.* (citation omitted). However, in order to seek redress under Section 1983, Plaintiffs "must assert the violation of a federal right, not merely a violation of federal law." *Id.* (citation omitted). In order to determine whether "a particular statutory provision gives rise to a federal right," courts have "traditionally looked at three factors." *Id.*

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Id.* (citations omitted). With this framework in mind, each of the Plaintiffs' federal statutory claims shall be considered in turn.

### a. *Adoption Assistance Act and MPA*

Plaintiffs' MPA claim appears to fall within a subset of the code . provisions Plaintiffs cite in support of their AACWA claim. Specifically, Plaintiffs point to 42 U.S.C. §§ 620–627 and 670–679a in support of their Adoption Assistance Act claim and 42 U.S.C. §§ 622(b)(9), 671(a)(18), and 674(d) in support of their MPA claim. *See* Compl. at ¶ 39. Therefore, these claims and their respective code provisions shall be examined in conjunction with each other. However, generally speaking, 42 U.S.C. §§ 620–627 deal with the program established to supply federal funds to states for child welfare services and 42 U.S.C. §§ 670–679a deal with the program established to supply federal funds to states for foster care and adoption assistance. More specifically, these code sections fit into the larger scheme of funding established in Parts A through E of Subchapter IV of Chapter 7 of the Social Security Act, which generally deals with grants to states for aid and services to needy families with children and for child-welfare services. For example, 42 U.S.C. §§ 620–627 fall within Part B, Subpart 1 and 42 U.S.C. §§ 670–679a fall within Part E of Subchapter IV of Chapter 7 of the Social Security Act.

### i. *Adoption Assistance Act*

Plaintiffs allege that, under the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, states, including New Jersey, receive federal money so long as they have submitted a plan approved by the United States Department of Health and Human Services, certify that the plan provides the child welfare services required by the Adoption Assistance Act, and comply with the terms of the plan. *See* Compl. at ¶ 61. Without citing any specific statutory provisions, Plaintiffs allege that they are being deprived of the following rights conferred upon them by the Adoption Assistance Act: i) right to have Defendants implement a pre-placement preventive services program designed to help children remain with their families or be returned to their families when appropriate; ii) right to timely written case plans that contain

mandated elements and to the implementation and review of these plans; iii) right to placement in foster homes or facilities that conform to nationally recommended professional standards; iv) right to placement in the least restrictive, most family-like setting; v) right to proper care while in custody; vi) right to be freed for adoption in accordance with the time frames established by law; vii) right to planning and services to secure their permanent placement at the earliest possible time; viii) right to regular judicial and administrative reviews of their foster care placements; ix) right to dispositional hearings within twelve months of entering custody and periodically thereafter; and x) right to receive services in a child welfare system with an adequate information system to permit decision-makers to make fully informed choices in the children's best interests. *Id.* at ¶ 404.

With respect to each right asserted, Defendants argue that under the *Blessing* framework, the Adoption Assistance Act provisions at issue are not so clear and unambiguous so as to create rights enforceable under § 1983. *See* Def. Motion at p. 4. Plaintiffs counter that under "established standards of statutory interpretation, the statutes create specific, enforceable rights." Pl.Opp. at p. 19. In their reply, Defendants reiterate their disagreement under the *Blessing* framework.

Initially, Defendants argue that any analysis of the Adoption Assistance Act provisions at issue must begin with the Supreme Court's analysis and decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), which reviewed an attempt to enforce a private right pursuant to § 1983 for an alleged violation of 42 U.S.C. § 671(a)(15). *See* Def. Motion at p. 6. Specifically, § 671(a)(15) provides that in order for a state to be eligible for federal payments for foster care and adoption assistance under § 670, the state shall have a Plan approved by the Secretary of Health and Human Services which provides that "reasonable efforts shall be made to preserve and reunify families." 42 U.S.C. § 671(a)(15)(B). The *Suter* Court noted that the pertinent inquiry under the *Blessing* framework with respect to § 671(a)(15) was did "Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." *Suter*, 503 U.S. at 357, 112 S.Ct. 1360. The *Suter* Court found that § 671(a)(15) did not unambiguously confer an enforceable right on individual children within the child welfare system because only "a rather generalized duty" was imposed upon the state, "to be enforced not by private individuals, but by the Secretary" in the manner set forth in the AACWA. *Id.* at 363, 112 S.Ct. 1360. Thus, the *Suter* Court found that the subject class of plaintiffs could not use § 1983 to enforce § 671(a)(15) of the AACWA. *See Suter*, 503 U.S. at 363, 112 S.Ct. 1360 (holding that "[c]areful examination of the language relied upon by [plaintiffs], in the context of the entire Act, leads us to conclude that the 'reasonable efforts' language does not unambiguously confer an enforceable right upon the Act's beneficiaries"). To the extent that *Suter* may have intimated that § 671(a)(15), or any other section of the Adoption Assistance Act for that matter, did not confer a private right enforceable under § 1983 simply because of its inclusion in a section requiring a State plan or specifying the required contents of such a plan, Congress amended the Social Security Act in 1994, specifically mentioning *Suter*. This amendment noted

[i]n an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand grounds for determining the availability of private actions to enforce State plan requirements other than by overturning

any such grounds applied in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a–2. However, this amendment did not overrule *Suter*. The amendment only forecloses the refusal to find a federal right enforceable under § 1983 because the statutory provision may be included in a section requiring a State plan or specifying the required contents of such a plan. *See Harris v. James*, 127 F.3d 993, 1002 (11th Cir.1997) (noting that 42 U.S.C. § 1320a–2 "does not purport to reject any and all grounds relied upon in Suter; it purports only to overrule certain grounds—i.e., that a provision is unenforceable simply because of its inclusion in a section requiring a state plan or specifying the contents of such a plan"). Therefore, with this important guideline in mind, each of Plaintiffs' asserted rights is examined in the context of whether, as noted in *Suter*, the provision at issue unambiguously confers a private right enforceable pursuant to § 1983 under the *Blessing* framework.

### 1. *right to pre-placement preventive services program*

■ Plaintiffs allege that the Adoption Assistance Act "requires defendants, as a condition to receiving federal funds, to implement and operate in New Jersey a pre-placement preventive services program designed to help children remain with their families, when safe and appropriate." Compl. at ¶ 63a. *See also* Compl. at ¶ 63b (alleging that the Adoption Assistance Act "requires defendants, as a condition to receiving federal funds, to implement and operate in New Jersey a service program designed to help children, when safe and appropriate, return to the families from which they have been removed, and when this is not possible to be placed for adop-

tion, for legal guardianship, or in some other planned, permanent living arrangement"). In this regard, Plaintiffs allege that as a result of Defendants' "actions and inactions," Plaintiffs are being deprived of their right "to have defendants implement a pre-placement preventive services program designed to help children remain with their families or be returned to their families when appropriate." *Id.* at ¶ 404. In their motion to dismiss, Defendants argue that, to the extent Plaintiffs are relying upon 42 U.S.C. § 622(b)(10)(B)(iii)(I) or 42 U.S.C. § 622(b)(10)(B)(iv) in support of this right, these subsections create no right enforceable under § 1983. *See* Def. Motion at p. 9. Plaintiffs respond that the Complaint "alleges that the lack of an operating preplacement preventive services program is demonstrated by the fact that there are virtually no available *preventive services available, that DYFS has failed to* promote and secure access to such services, and that there is no coordination of preventive services at either the state or county level." Pl.Opp. at p. 36 (citation omitted). Defendants reply that there is "no objective measure for the adequacy of pre-placement services contained in AACWA," and therefore, 42 U.S.C. § 622(b)(10)(B) does not unambiguously confer upon Plaintiffs the right enforceable pursuant § 1983 to a pre-placement preventive services program designed to help children remain with their families or be returned to their families when appropriate. Def. Reply at p. 8.

42 U.S.C. § 622(b)(10) provides, in relevant part, that "[e]ach plan for child welfare services under [42 U.S.C. § 622(a) ] shall—provide assurances that the State— is operating, to the satisfaction of the Secretary—a service program designed to help children—where safe and appropriate, return to families from which they have been removed ...; and a preplacement preventive services program designed to help children at risk of foster care placement remain safely with their families." 42 U.S.C. § 622(b)(10)(B)(iii)(I)

and 42 U.S.C. § 622(b)(10)(B)(iv). First, the plain language of 42 U.S.C. § 622(b)(10)(B) indicates that such pre-placement preventive services programs must be operating *"to the satisfaction of the Secretary."* Clearly, this Court does not sit to oversee New Jersey's child welfare system to determine whether certain components of the system are "operating, *to the satisfaction of the Secretary."* See *Blessing,* 520 U.S. at 341 and 345, 117 S.Ct. 1353 (noting that a request by plaintiffs for a "broad injunction requiring the director of Arizona's child support agency to achieve 'substantial compliance' " and "[a]ttributing the deficiencies in the State's program primarily to staff shortages and other structural defects" inappropriately "invited the District Court to oversee every aspect of Arizona's Title IV–D program") (citation omitted).

Moreover, under the *Blessing* test, 42 U.S.C. § 622(b)(10)(B) does not unambiguously confer upon Plaintiffs the right enforceable pursuant § 1983 to "pre-placement preventive services program designed to help children remain with their families or be returned to their families *when appropriate."* See *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 24–25, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (holding that "[i]t is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting"); *B.H. v. Johnson,* 715 F.Supp. 1387, 1401 (N.D.Ill.1989) (examining purpose of Title IV–B [of the Social Security Act, 42 U.S.C. §§ 620–628b,] as set forth in language of 42 U.S.C. § 620(a) in light of "similar language [set forth in the Developmentally Disabled Assistance and Bill of Rights Act] in Pennhurst" and holding that "Congress intended Title IV–B to be an expression of goals and guiding principles *rather than an enactment that creates enforceable federal rights* " and that "[n]othing in Title IV–B can be said to intend the creation of the kind of rights to which a remedy in favor of persons such as plaintiffs could attach") (emphasis added). See also *Eric L. v. Bird,* 848 F.Supp. 303, 312 (D.N.H.1994) (holding that "plaintiffs enjoy no enforceable rights under" 42 U.S.C. § 627(a)(2)(C), which is the predecessor to, and contains nearly the identical language as, 42 U.S.C. § 622(b)(10)(B)(iii)(I) and (II)). Therefore, for these reasons, Plaintiffs' § 1983 claim under 42 U.S.C. § 622(b)(10)(B) for a "pre-placement preventive services program designed to help children remain with their families or be returned to their families when appropriate" is dismissed.

2. *right to timely written case plans*

■ Plaintiffs also allege that "[t]he Adoption Assistance Act and relevant regulations further require that if defendants accept federal funds, they shall take steps necessary to ensure that each foster child is provided with a written case plan, containing specified elements, that is reviewed and updated at specified intervals, and that services are provided in accordance with that plan." Compl. at ¶ 64d. In this regard, Plaintiffs allege that as a result of Defendants "actions and inactions," Plaintiffs are being deprived of their right "to timely written case plans that contain mandate elements and to the implementation and review of these plans." *Id.* at ¶ 404. In their motion to dismiss, Defendants argue that, to the extent Plaintiffs are relying upon 42 U.S.C. § 671(a)(16) in support of this right, this subsection does not create a right enforceable under § 1983. See Def. Motion at p. 12. Specifically, Defendants argue that "Plaintiffs do not complain that New Jersey has failed to provide case plans." *Id.* Instead, Plaintiffs disagree "with the contents and 'implementation' of these plans." *Id.* For example, Defendants note that Barry M. is the only Plaintiff to allege that Defendants have failed to provide him a written case plan. *Id.* However, on closer examination, Defendants also note that Barry M. alleges "that DYFS has failed 'to provide a written case plan, reviewed annually, *to prepare him for self-sufficient living.'* " *Id.* (citing

Compl. at ¶ 204) (emphasis added). Defendants argue that such disagreement is not actionable under 42 U.S.C. § 671(a)(16) pursuant to § 1983. Plaintiffs respond that not only do Plaintiffs have a right to "an enforceable written case plan and a case review system" under 42 U.S.C. § 622(b)(10)(B)(ii), 42 U.S.C. § 671(a)(16), and 42 U.S.C. § 675(1) and (5), but Plaintiffs also have an "enforceable right to implementation of case plan services." Pl. Opp. at pp. 22–26 and 26–29. Defendants reply that even if there is a right to a case plan and/or review system, there is no right of each individual child to enforce the particulars of his or her plan, because to do so would require a court to act without an objective measure against which to gauge a state's actions. See Def. Reply at pp. 4–5. Therefore, Defendants argue that the AACWA does not unambiguously confer upon Plaintiffs the right enforceable pursuant § 1983 to "timely written case plans that contain mandate elements and to the implementation and review of these plans." Id.

42 U.S.C. § 622(b)(10)(B)(ii) provides, in relevant part, that "[e]ach plan for child welfare services under [42 U.S.C. § 622(a) ] shall—provide assurances that the State—is operating, to the satisfaction of the Secretary—a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State." 42 U.S.C. § 671(a)(16) provides, in relevant part, that "[i]n order for a State to be eligible for payments under [42 U.S.C. § 670], it shall have a plan approved by the Secretary which—provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child." Finally, 42 U.S.C. § 675(1) and (5) define, in detail, "case plan" as used in 42 U.S.C. § 671(a)(16) and "case review system" as used in 42 U.S.C. § 622(b)(10)(B)(ii). Spe-

cifically, "case plan" means a written document which includes at least the following:

(A) A description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title.

(B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

(C) To the extent available and accessible, the health and education records of the child, including—

(i) the names and addresses of the child's health and educational providers;

(ii) the child's grade level performance;

(iii) the child's school record;

(iv) assurances that the child's placement in foster care takes into account proximity to the school in which the child is enrolled at the time of placement;

(v) a record of the child's immunizations;

(vi) the child's known medical problems;

(vii) the child's medications; and

(viii) any other relevant health and education information concerning the child determined to be appropriate by the State agency.

(D) Where appropriate, for a child age 16 or over, a written description of the programs and services which will help

such child prepare for the transition from foster care to independent living. (E) In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems.

42 U.S.C. § 675(1). Moreover, "case review system" means a procedure for assuring that—

(A) each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child, which—

(i) if the child has been placed in a foster family home or child-care institution a substantial distance from the home of the parents of the child, or in a State different from the State in which such home is located, sets forth the reasons why such placement is in the best interests of the child, and

(ii) if the child has been placed in foster care outside the State in which the home of the parents of the child is located, requires that, periodically, but not less frequently than every 12 months, a caseworker on the staff of the State agency of the State in which the home of the parents of the child is located, or of the State in which the child has been placed, visit such child in such home or institution and submit a report on such visit to the State agency of the State in which the home of the parents of the child is located,

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the safety of the child the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship,

(C) with respect to each such child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than 12 months after the date the child is considered to have entered foster care (as determined under subparagraph (F)) (and not less frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, or referred for legal guardianship, or (in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian) placed in another planned permanent living arrangement and, in the case of a child

described in subparagraph (A)(ii), whether the out-of-State placement continues to be appropriate and in the best interests of the child, and, in the case of a child who has attained age 16, the services needed to assist the child to make the transition from foster care to independent living; and procedural safeguards shall also be applied with respect to parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation privileges of parents;

(D) a child's health and education record (as described in paragraph (1)(A)) is reviewed and updated, and supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care;

(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless—

(i) at the option of the State, the child is being cared for by a relative;

(ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

(iii) the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to the child;

(F) a child shall be considered to have entered foster care on the earlier of—

(i) the date of the first judicial finding that the child has been subjected to child abuse or neglect; or

(ii) the date that is 60 days after the date on which the child is removed from the home; and

(G) the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and an opportunity to be heard in, any review or hearing to be held with respect to the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child be made a party to such a review or hearing solely on the basis of such notice and opportunity to be heard.

42 U.S.C. § 675(5).

Initially, as noted above and as will be repeated herein, this Court does not sit to oversee New Jersey's child welfare system to determine whether the implementation of case plans is "appropriate" or "successful." *See Blessing,* 520 U.S. at 341 and 345, 117 S.Ct. 1353. This is especially true where "[w]hether a child has a plan satisfying [each] provision is as individual as each child" and "there is no way to measure the normal or average needs of a child in foster care." *Del A. v. Roemer,* 777 F.Supp. 1297, 1309 (E.D.La.1991). Moreover, regardless of the detailed na-

ture of the definitions of "case plan" and "case review system," the statutory provisions relied upon by Plaintiffs in support of their alleged right "to timely written case plans that contain mandate elements and to the implementation and review of these plans" are not so unambiguous so as to confer upon Plaintiffs a right enforceable under § 1983. *See Eric L. v. Bird,* 848 F.Supp. 303, 312 (D.N.H.1994) (holding that "plaintiff enjoy no enforceable rights" to "compel New Hampshire's full implementation of the programs" under 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), because the provision "places no direct obligation on the state"); *Baby Neal v. Casey,* 821 F.Supp. 320, 328 (E.D.Pa.1993) (holding that the language of § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), "examined in the context of the entire Adoption Act" does not "unambiguously confer an enforceable right on behalf of its beneficiaries under 42 U.S.C. § 1983"); *Del A. v. Roemer,* 777 F.Supp. 1297, 1308–09 (E.D.La.1991) (holding 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), and 42 U.S.C. § 671(a)(16) "so vague and amorphous as to evade judicial enforcement" of plaintiffs' claim for "case plans that address specific issues in their placements and care" because "[t]here is no objective benchmark" against which compliance with these provisions can be measured).

Finally, as discussed below in connection with Plaintiffs' MPA claim, both parties have failed to note the important point, which hinders Plaintiffs' claim under 42 U.S.C. § 671(a)(16) with respect to case plans, that Congress specifically examined the numerous State plan elements required under 42 U.S.C. § 671 and determined that only *one* such required element

confers a private right enforceable pursuant to § 1983. Specifically, in 1996, Congress amended 42 U.S.C. § 674 by adding subsection (d) which *explicitly* provides that "[a]ny individual who is aggrieved by a violation of *Section 671(a)(18) of this title* by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." 42 U.S.C. § 674(d)(3)(A) (emphasis added). That Congress recently chose to amend 42 U.S.C. § 674 to include a private right of action under § 1983 for a state or other entity's failure to comply with 42 U.S.C. § 671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and relied upon by Plaintiffs, is strong evidence that Congress did not intend these other various State plan elements in 42 U.S.C. § 671(a) to confer rights enforceable pursuant to § 1983. *See Wright v. Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (noting that a court may look to "other specific evidence from the statute itself" to determine whether § 1983 provides a remedial cause of action). Therefore, for this and the other reasons set forth herein, Plaintiffs § 1983 claim to "an enforceable written case plan and a case review system" under 42 U.S.C. § 622(b)(10)(B)(ii), 42 U.S.C. § 671(a)(16), and 42 U.S.C. § 675(1) and (5) and an "enforceable right to implementation of case plan services" is dismissed.[2]

### 3. *right to placement in the least restrictive, most family-like setting*

■ Further, based upon the definition of "case review system" in 42 U.S.C. § 675(5), Plaintiffs allege that, "if defendants accept federal funds, they shall take steps necessary to ensure that each child

---

**2.** For the very same reasons, Plaintiffs' § 1983 claims asserting a right to "planning and services to secure their permanent placement at the earliest possible time, including documentation of the steps taken to secure permanency" under 42 U.S.C. § 675(1)(E) and to "regular judicial and administrative

reviews of foster care placements" and to "dispositional hearings within twelve months of entering custody and periodically thereafter" under 42 U.S.C. § 671(a)(16), 42 U.S.C. § 671(b)(10)(B)(ii), and 42 U.S.C. § 675(5), are similarly dismissed. *See* Compl. at ¶ 404.

in need of a foster care placement is placed in the least restrictive, most family-like setting available, consistent with her best interests and individual needs." Compl. at ¶ 64b. In this regard, Plaintiffs allege that Defendants' "actions and inactions" deprived them of the right to "placement in the least restrictive, most family-like setting." *Id.* at ¶ 404. Having already determined that 42 U.S.C. § 622(b)(10)(B)(ii), which incorporates the definition of "case review system" in 42 U.S.C. § 675(5), does not confer rights upon Plaintiffs enforceable pursuant to § 1983, it is not necessary to go further to determine whether 42 U.S.C. § 675(5), standing alone, confers a right upon Plaintiffs enforceable pursuant to § 1983. *See B.H. v. Johnson*, 715 F.Supp. 1387, 1401 (N.D.Ill.1989) (noting "[i]t would be strange for Congress to create enforceable rights in the definitional section of a statute" and holding that while the "AAA creates an enforceable right to an individualized 'case plan' and 'case review system,' . . . [b]eyond the narrow requirements of a case plan and case review system, the AAA does not impose on the state the sweeping duties alleged by plaintiffs" and specifically holding that "we do not believe Congress intended to create an enforceable individual right of placement in the least restrictive (most family-like) setting"). Moreover, it is important to note that several courts have rejected similar claims under § 1983 to enforce the right to placement in the least restrictive, most family-like setting because such a right is too vague and amorphous to be judicially enforceable. *See Pennhurst*, 451 U.S. at 24–25, 101 S.Ct. 1531 (holding that "[i]t is difficult to know what is meant by

providing 'appropriate treatment' in the 'least restrictive' setting"); *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1012 (N.D.Ill. 1989) (holding that the "right to be placed 'in the least restrictive, most family like setting' . . . [is] amorphous and not subject to precise definition") (citing *Pennhurst*, 451 U.S. at 24–25, 101 S.Ct. 1531). Therefore, Plaintiffs' § 1983 claim under 42 U.S.C. § 622(b)(10)(B)(ii) and/or 42 U.S.C. § 675(5) to placement in the least restrictive, most family-like setting is dismissed.[3]

#### 4. *right to nationally recommended professional standards*

■ Plaintiffs allege that the Adoption Assistance Act and "relevant regulations" require "that if defendants accept federal funds, they shall take the steps necessary to ensure that foster family homes and child care institutions are licensed, relicensed and operated in conformity with appropriate national standards." Compl. at ¶ 64a. In this regard, Plaintiffs allege that as a result of Defendants' "actions and inactions," Plaintiffs are being deprived of their right "to placement in foster homes or facilities that conform to nationally recommended professional standards." *Id.* at ¶ 404. In their motion to dismiss, Defendants argue that, to the extent Plaintiffs are relying upon 42 U.S.C. § 671(a)(10) in support of this right, this Court should agree with the number of courts that have held that because the Adoption Assistance Act and any relevant regulations do not specify any such national standards, § 671(a)(10) does not support such a right. *See* Def. Motion at p. 14 (citations omitted). Plaintiffs respond that § 671(a)(10)

---

**3.** Moreover, Plaintiffs' § 1983 claim for "safe and proper care," *see* Compl. at ¶ 63e and Pl.Opp. at p. 31, under 42 U.S.C. § 675(1)(B) and/or 42 U.S.C. § 671(a)(22) is dismissed for the same reasons as set forth herein with respect to Plaintiffs' claims for: i) a "case plan" and a "case review system" under 42 U.S.C. § 622(b)(10)(B)(ii), 42 U.S.C. § 671(a)(16), and 42 U.S.C. § 675(1) and (5); ii) "planning and services to secure their permanent placement at the earliest possible time, including documentation of the steps

taken to secure permanency" under 42 U.S.C. § 675(1)(E); iii) "regular judicial and administrative reviews of foster care placements" and to "dispositional hearings within twelve months of entering custody and periodically thereafter" under 42 U.S.C. § 671(a)(16), 42 U.S.C. § 671(b)(10)(B)(ii), and 42 U.S.C. § 675(5); and iv) "placement in the least restrictive, most family-like setting" under 42 U.S.C. § 622(b)(10)(B)(ii) and/or 42 U.S.C. § 675(5).

"refers explicitly to external, objective standards: 'recommend standards of national organizations concerned with standards for such institutions or homes'" and that "[s]ince such standards are routinely promulgated by national organizations such as the Child Welfare League of America, § 671(a)(10) is sufficiently clear to be enforceable." Pl.Opp. at p. 32. Defendants reply that the plain language of § 671(a)(10) does not allow the "state [to be] subject to suit in federal court," as Plaintiffs have alleged, where "a single 'foster family home' or 'child care institution' is not in compliance with the state-promulgated standards." Def. Reply at p. 6.

42 U.S.C. § 671(a)(10) provides, in relevant part, that "[i]n order for a State to be eligible for payments under [42 U.S.C. § 670], it shall have a plan approved by the Secretary which—provides for the establishment or designation of a State authority ... which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds under this part or part B of this subchapter." Plaintiffs' alleged right to "placement in foster homes or facilities that conform to nationally recommended professional standards" based upon 42 U.S.C. § 671(a)(10) is too vague and amorphous under the *Blessing* test to be enforced pursuant § 1983. First, the very provision relied upon by Plaintiffs in support of their claim "to placement in foster homes or facilities that conform to nationally recommended professional standards" has been flatly rejected as the basis for such a right enforceable under § 1983. *See Yvonne L. v. New Mexico Dep't of Human Serv.*, 959 F.2d 883, 889, 890 (10th

Cir.1992) (holding that "[t]he language of § 671(a)(10) by itself does not support ... a cause of action [for a right to care in a foster home with standards reasonably in accord with those of national organizations]. It only references 'standards of national organizations concerned with standards for such institutions or [foster] homes.' *That is the type of vague and amorphous language identified in Wilder ... and Wright ... that cannot be judicially enforced.*") (citations omitted) (emphasis added); *Baby Neal v. Casey*, 821 F.Supp. 320, 326–327 (E.D.Pa.1993) (holding that "§ 671(a)(10) fails to unambiguously confer upon [p]laintiffs a private right of enforcement under this provision" because "[t]he language of this section does not confer upon [p]laintiffs a 'right' to foster homes or institutions which are in accord with recommended standards of national organizations but *clearly states that the state plan must provide for the designation of a state authority or authorities which shall establish and maintain such standards.* Moreover, 'reasonably in accord' is as vague and ambiguous as 'reasonable efforts' under § 671(a)(15).") (emphasis added); *Doe v. Johnson*, 1993 WL 50845, *3 (N.D.Ill. Feb.24, 1993) (dismissing plaintiff's action "to the extent that it seeks private relief for an alleged violation of § 671(a) of the Adoption Assistance and Child Welfare Act" because "the Act places its enforcement mechanism in hands other than those of private plaintiffs under § 1983"); *Del A. v. Roemer*, 777 F.Supp. 1297, 1310 (E.D.La.1991) (comparing "reasonably in accord with" language of 42 U.S.C. § 671(a)(10) with "reasonable efforts" language of 42 U.S.C. § 671(a)(15) and holding that the "provision requiring placement in foster homes and institutions that are 'reasonably in accord with' national standards is vague and unenforceable"). Moreover, as discussed above, that Congress recently chose to amend 42 U.S.C. § 674 to include a private right of action under § 1983 for a state or other entity's failure to comply with 42 U.S.C.

§ 671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and relied upon by Plaintiffs, is strong evidence that Congress did not intend these other various State plan elements in 42 U.S.C. § 671(a) to confer rights enforceable pursuant to § 1983. Therefore, Plaintiffs § 1983 claim under 42 U.S.C. § 671(a)(10) for "placement in foster homes or facilities that conform to nationally recommended professional standards" is dismissed.

### 5. *right to adequate information system*

■ Plaintiffs allege that the Adoption Assistance Act requires Defendants, "as a condition to receiving federal funds, to implement and operate in New Jersey an information system from which the status, demographic characteristics, location and goal of every foster child can readily be determined." Compl. at ¶ 63c. In this regard, Plaintiffs allege that as a result of Defendants' "actions and inactions," Plaintiffs are being deprived of their right "to receive services in a child welfare system with an adequate information system to permit decision-makers to make fully informed choices in the children's best interests." *Id.* at ¶ 404. In support of their motion to dismiss, Defendants argue that numerous courts have rejected such a right to an "information system" to the extent Plaintiffs are relying upon 42 U.S.C. § 622(b)(10)(B) in support of this right. *See* Def. Motion at p. 21 (citing *Eric L. v. Bird,* 848 F.Supp. 303) (D.N.H. 1994); *Baby Neal v. Casey,* 821 F.Supp. 320 (E.D.Pa.1993)). Plaintiffs respond that the decisions relied upon by Defendants are "no longer good law" for various reasons, including *Suter* and the 1994 amendment to the Social Security Act. *See* Pl.Opp. at p. 35. Defendants reply that, while cases such as *Eric L.* and *Baby Neal* may have been decided prior to *Suter* and the 1994 amendment to the Social Security Act, such cases should still be considered for their general holdings that this section of the Adoption Assistance Act "simply does not demonstrate a congressional intent to benefit individual children." Def. Reply at p. 7.

42 U.S.C. § 622(b)(10)(B) provides, in relevant part, that "[e]ach plan for child welfare services under [42 U.S.C. § 622(a) ] shall ... provide assurances that the State ... is operating, to the satisfaction of the Secretary—a statewide information system from which can be readily determined the status, demographic characteristics, location, and goals for the placement of every child who is ... in foster care." 42 U.S.C. § 622(b)(10)(B)(i). Plaintiffs' alleged right to "receive services in a child welfare system with an adequate information system to permit decision-makers to make fully informed choices in the children's best interests" based upon 42 U.S.C. § 622(b)(10)(B)(i) is too vague and amorphous under the *Blessing* test to be enforced under § 1983. First, this Court does not sit to oversee New Jersey's child welfare system and determine whether a state information system "operating, *to the satisfaction of the Secretary,*" is also "adequate." *See Blessing,* 520 U.S. at 341 and 345, 117 S.Ct. 1353 (noting that a request by plaintiffs for a "broad injunction requiring the director of Arizona's child support agency to achieve 'substantial compliance'" and "[a]ttributing the deficiencies in the State's program primarily to staff shortages and other structural defects" inappropriately "invited the District Court to oversee every aspect of Arizona's Title IV-D program" and holding that enforcement of "such an undefined standard" as the right to a "sufficient staff" would "certainly 'strain judicial competence' ") (citation omitted). Moreover, similar attempts under § 1983 to enforce the right to information systems provided for in federal funding statutes have been flatly rejected. For example, in *Blessing,* Title IV-D of the Social Security Act laid out "detailed requirements for the State's data processing system." *Blessing,* 520 U.S. at 344, 117 S.Ct. 1353. Specifically, 42 U.S.C. § 654a and implementing regulations required "[a]mong other things, [that] this

system must sort information into standardized data elements specified by the Secretary; transmit information electronically to the State's AFDC system to monitor family eligibility for financial assistance; maintain the date necessary to meet federal reporting requirements; and provide for the electronic transfer of funds for purposes of income withholding and interstate collections." *Id.* (citations omitted). Despite the fact that this provision and its implementing regulations "may ultimately benefit individuals who are eligible for Title IV–D services," the *Blessing* Court found that such benefit was only achieved "indirectly," and held that "these complex standards do not give rise to individualized rights to computer services." *Id.* at 344 and 345, 117 S.Ct. 1353. Indeed, the *Blessing* Court held that the provision for computer services did "not fit our traditional three criteria for identifying statutory rights," but instead, was "simply intended to improve overall efficiency of the States' child support enforcement scheme." *Id.* Finally, the very provision relied upon by Plaintiffs in support of their claim "to receive services in a child welfare system with an adequate information system to permit decision-makers to make fully informed choices in the children's best interests" has been flatly rejected as a basis for the "right to an information system" enforceable under § 1983. *See Del A. v. Roemer,* 777 F.Supp. 1297, 1305–06 (E.D.La.1991) (holding that the "information system [under 42 U.S.C. § 622(b)(10)(B)(i) ] clearly serves only an administrative tool and is not intended as a benefit to the putative plaintiffs. Thus, plaintiffs have no enforceable right to an information system."). Therefore, Plaintiffs' § 1983 claim under 42 U.S.C.

§ 622(b)(10)(B)(i) for an "adequate information system" is dismissed.

For all these reasons, Defendants' motion to dismiss is granted with respect to the Fourth Count of Plaintiffs' Complaint.[4]

### ii. *MPA*

As noted, some of the general code provisions cited by Plaintiffs in support of their claims under the Adoption Assistance Act include those provisions identified by Plaintiffs in support of their claims under the federal Multiethnic Placement Act of 1994, as amended by the Interethnic Adoption Provisions of 1996. In this regard, Plaintiff allege that the MPA "requires that public agencies engage in aggressive efforts to recruit potential foster and adoptive parents who reflect the racial and ethnic diversity of the children for whom such foster and adoptive placements are needed." Compl. at ¶ 69. Further, Plaintiffs allege that the MPA "prohibits ... [the denial to] any person the opportunity to become an adoptive or a foster parent on the basis of the race, color or national origin of the child or adoptive or foster parent and prohibits the delay or denial of the placement of a child for adoption or into foster care on that same basis." *Id.* Plaintiffs specifically cite 42 U.S.C. §§ 622(b)(9), 671(a)(18), and 674(d) in support of their claims under the MPA and allege that due to Defendants' "actions and inactions," Plaintiffs are "being deprived of the rights conferred upon them by the [MPA]," including, but not limited to, "the right not to have adoptive or foster placements delayed or denied on the basis of the race, color or national origin of the foster or adoptive parent or of the child." *Id.* at ¶¶ 39 and 407.

42 U.S.C. § 622(b)(9) provides that, in order to be eligible for the federal funding

---

4. The decision to grant Defendants' motion to dismiss with respect to the Fourth Count of Plaintiffs' Complaint includes the alleged right "to be freed for adoption," *see* Compl. at ¶ 404, which appears to have been given little attention in the parties' briefing. *See* Pl.Opp. at p. 29, n. 7 and Def. Reply at p. 3, n. 1. In this regard, Plaintiffs' alleged right to be freed

for adoption in accordance with "the time frames established by law" suffers from many of the same flaws as Plaintiffs' other claims under the AACWA, including improperly asking this Court to oversee DYFS's compliance with state law, which although not discussed at length herein, also raises serious Eleventh Amendment concerns.

provided in 42 U.S.C. § 620 to states for "establishing, extending, and strengthening child welfare services," *see* 42 U.S.C. § 620(a), each plan for child welfare services developed pursuant to 42 U.S.C. § 622(a) shall "provide for the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of the children in the State for whom such foster and adoptive homes are needed." Section 671(a)(18) provides that, in order to be eligible for federal funding provided in 42 U.S.C. § 670 to states for "foster care and transitional living" and "adoption assistance for children with special needs." each State plan for foster care and adoption assistance developed pursuant to Section 670 shall provide that "neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements" may "deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color or national origin of the person, or of the child, involved," or "delay or deny the placement of a child for adoption or into foster care" on that same basis. Finally, 42 U.S.C. § 674(d) provides that if a state is found to have failed to comply with 42 U.S.C. § 671(a)(18), "the Secretary shall reduce the amount otherwise payable to the State under this part . . . until the program is found . . . to have implemented a corrective action plan with respect to such violation. . . ." 42 U.S.C. § 674(d)(1).[5]

With respect to these provisions, Defendants argue that Plaintiffs lack standing to bring a claim under the MPA because Plaintiffs have failed to allege that: i) they have been "injured by the purported lack of adoptive parents of all races;" or ii) there has been discrimination in foster care placements or they have been injured as a result of discrimination in foster care

placements. *See* Def. Motion at p. 25. Defendants further argue that Plaintiffs cannot stand in the shoes of the Secretary and demand a reduction in the amounts otherwise payable to the State for child welfare services. *Id.* Plaintiffs counter that they have alleged a "quintessential violation" of the MPA and provide by way of example the placement of Marco and Juan C., "who are Hispanic, [and] were placed in foster home with foster parents that speak almost exclusively Spanish, despite the fact that the boys speak only English." Pl. Opp. at p. 43. Given this, Plaintiffs allege that Defendants made a foster placement decision "based on an ethnic 'match' between Juan and Marco and the foster parents." *Id.* Defendants reply that the sections of the MPA relied upon by Plaintiffs specifically prohibit "delay or denial of placement because of race or ethnicity." and Plaintiffs have not alleged that Juan and Marco C., or any other Plaintiffs, have experienced any delay or denial of foster or adoptive placement because of race or ethnicity. *See* Def. Reply at p. 10.

■ With respect to 42 U.S.C. § 671(a)(18)(A), which requires that a State plan provide that the State may not "deny to any person the opportunity to become an adoptive parent or a foster parent, on the basis of race, color, or national origin of the person, or of the child, involved," Plaintiffs do not assert a claim on behalf of any person who was denied the opportunity to become an adoptive or foster parent because of race, color, or national origin. *See* Compl. at ¶ 407 (asserting claim on behalf of "the plaintiff children . . . being deprived of . . . the right not to have adoptive or foster placements delayed or denied on the basis of race, color or national origin of the foster or adoptive parent or of the child").[6] Thus, to the extent Plaintiffs fail to allege

---

5. Further, although neither party mentions it, 42 U.S.C. § 674(d) also *explicitly* provides that "[a]ny individual who is aggrieved by a violation of section 671(a)(18) of this title by a State or other entity may bring an action seeking relief from the State or other entity in

any United States district court." 42 U.S.C. § 674(d)(3)(A).

6. Even if Plaintiffs had attempted to assert such a claim, it would raise serious questions of standing. Further, with respect to 42

a cause of action on behalf of any person who was denied the opportunity to become an adoptive or foster parent because of race, color, or national origin, Defendants' motion to dismiss is granted.

■ However, with respect to Plaintiffs' claim under 42 U.S.C. § 671(a)(18)(B),· which requires that a State plan provide that the State may not "delay or deny the placement of a child for adoption or into foster care, on the basis of race, color, or national origin of the adoptive or foster parent, or the child, involved," an examination of the language and structure of Part E of Subchapter IV of Chapter 7 of the Social Security Act compels a determination that Plaintiffs may assert a right under 42 U.S.C. § 671(a)(18)(B) pursuant to § 1983. Specifically, as noted above, 42 U.S.C. § 674(d) *explicitly* provides that "[a]ny in-

U.S.C. § 622(b)(9) which provides that, in order to be eligible for the federal funding provided in 42 U.S.C. § 620 to states for "establishing, extending, and strengthening child welfare services," *see* 42 U.S.C. § 620(a), each plan for child welfare services developed pursuant to 42 U.S.C. § 622(a) shall "provide for the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of the children in the State for whom such foster and adoptive homes are needed," Plaintiffs have failed to assert a claim that there has not been diligent recruitment. *See* Compl. at ¶ 407 (asserting claim on behalf of "the plaintiff children . . . being deprived of . . . the right not to have adoptive or foster placements delayed or denied on the basis of race, color or national origin of the foster or adoptive parent or of the child"). Even if Plaintiffs had asserted a claim for "diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of the children in the State for whom such foster and adoptive homes are needed," under *Blessing,* such a claim would be too vague and amorphous to lend itself to proper judicial administration. Indeed, as was the holding in *Blessing,* enforcement of such undefined rights like the right to "diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of the children in the State for whom such foster and adoptive homes are needed," would certainly strain the judicial competence.

dividual who is aggrieved by a violation of Section 671(a)(18) of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." 42 U.S.C. § 674(d)(3)(A). Thus, while it may present a statute of limitations question to be addressed in the future, to the extent Plaintiffs allege a violation of 42 U.S.C. § 671(a)(18)(B) on behalf of Marco and Juan C., which requires that a State plan provide that the State may not "delay or deny the placement of a child for adoption or into foster care, on the basis of race, color, or national origin of the adoptive or foster parent, or the child, involved," under § 1983, and as permitted in 42 U.S.C. § 674(d)(3)(A), Defendants' motion to dismiss is denied.[7]

Therefore, for these reasons, Defendants' motion to dismiss is granted in part

7. However, to the extent Plaintiffs rely upon 42 U.S.C. § 674(d)(1), which provides that "[i]f, . . ., a State's program operated under [Part E of Subchapter IV of Chapter 7 of the Social Security Act] is found, as a result of a review conducted under section 1320a–2a of this title, or otherwise, to have violated paragraph (18) . . . of section 671(a) of this title *with respect to a person* or to have failed to implement a corrective action plan within a period of time not to exceed 6 months with respect to such violation, then, . . ., *the Secretary* shall reduce the amount otherwise payable to the State under this part, . . ., until the program is found, . . ., to have implemented a corrective action plan with respect to such violation," Defendants' motion to dismiss is granted. This section of the MPA specifically provides that the federal government may reduce the funding provided pursuant to 42 U.S.C. § 670. However, the Secretary cannot compel New Jersey, or any other state, to act in a certain way with respect to a certain individual. *See Blessing,* 520 U.S. at 344, 117 S.Ct. 1353 (noting that "even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; *she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals.* In short, the substantial compliance standard is designed simply to trigger penalty provisions that . . . reduce the State's AFDC grant by a maximum of five percent. As such, *it does not give rise to individual rights.*") (emphasis added).

and denied in part to the extent as noted herein with respect to the Seventh Count of Plaintiffs' Complaint.

### b. *Child Abuse Prevention and Treatment Act*

■ Similar to their claims under the Adoption Assistance Act and MPA, Plaintiffs also allege that under the federal Child Abuse Prevention and Treatment Act, states, including New Jersey, receive federal money so long as they have submitted and complied with a plan approved by the United States Department of Health and Human Services which certifies that the state has in effect, and is enforcing, state law or programs relating to child abuse and neglect as required by CAPTA. *See* Compl. at ¶ 66. Generally, Plaintiffs cite to 42 U.S.C. §§ 5101–5106a in support of their CAPTA claim. *Id.* at ¶ 39. Specifically, in opposition to Defendants' motion to dismiss, Plaintiffs point to 42 U.S.C. § 5106a(b)(2), *see* Pl.Opp. at p. 38, n. 11, which provides

> [a] State plan submitted under [42 U.S.C. § 5106a(b)(1) ] ... shall contain an outline of the activities that the State intends to carry out using amounts received under the grant to achieve the purposes of this subchapter, including— an assurance ... that the State has in effect and is enforcing a State law, or has in effect and is operating a State-wide program, relating to child abuse and neglect that includes—provisions and procedures for the reporting of known and suspected instances of child abuse and neglect; procedures for the immediate screening, safety assessment, and prompt investigation of such reports; [and] procedures for immediate steps to be taken to ensure and protect the safety of the abused or neglected child and any other child under the same care who may also be in danger of abuse or neglect and ensuring their placement in a safe environment.

42 U.S.C. § 5106a(b)(2)(A)(i)–(iii). Given this provision, Plaintiffs allege that they are being deprived of the right, conferred upon them by CAPTA, "to the enforcement of laws requiring prompt and professional investigations of allegations of abuse or neglect" and the right "to protection from those who endanger their health and welfare." *Id.* at ¶ 405.

With respect to Plaintiffs' CAPTA claim, Defendants argue that while CAPTA provides that states that accept federal grants for child abuse and neglect prevention and treatment programs must have in place a State plan which outlines procedures for dealing with child abuse and the protection of children, every federal court to have addressed the issue, save one, has agreed "it does not mandate that particular procedures or protective steps be taken," and therefore, CAPTA does not confer a private right enforceable pursuant to § 1983. Def. Motion at p. 22 (citing 42 U.S.C. § 5106a(b)(2)). Plaintiffs counter that CAPTA does provide a private right enforceable under § 1983 because "plaintiffs' allegations are that defendants are not 'enforcing' state law or 'operating' a state-wide program with the required 'provisions and procedures' to protect abused and neglected children." Pl.Opp. at p. 39. Defendants reply that regardless of Plaintiffs' factual allegations, the provisions of CAPTA cited by Plaintiffs have been held far too vague and amorphous to create private rights enforceable under § 1983. *See* Def. Reply at p. 9, n. 3.

Clearly, under the *Blessing* test, the weight of case law dictates that 42 U.S.C. § 5106a(b)(2) "does not create a private right of action" under § 1983. *Jordan v. City of Philadelphia*, 66 F.Supp.2d 638, 648–49 (E.D.Pa.1999) (holding that "CAPTA clearly does not create a private right of action under 42 U.S.C. § 1983"). *See also Doe v. District of Columbia*, 93 F.3d 861, 868 (D.C.Cir.1996) (holding that "Section 5106a(b)(2) of CAPTA fails to unambiguously confer an enforceable right upon its beneficiaries, therefore [plaintiff's] claim under § 1983 was appropriately rejected by the district court"); *Tony L. v. Childers*, 71 F.3d 1182, 1189 (6th Cir.1995)

(holding that "neither CAPTA nor the relevant regulations mandate a particular means of investigation or state what type of actions must be taken to protect abused or neglected children"), *cert. denied,* 517 U.S. (1996); *A.S. v. Tellus,* 22 F.Supp.2d 1217, 1224 (D.Kan.1998) (agreeing with "the majority of courts" and holding that the requirements of 42 U.S.C. § 5106a(b)(2) "are too vague to create an enforceable right"); *Baby Neal v. Ridge,* 1995 WL 728589, *5 (E.D.Pa. Dec. 7, 1995) (reaffirming its holding on reconsideration "that [CAPTA] does not give rise to an enforceable private right of action under 42 U.S.C. § 1983"); *Eric L. v. Bird,* 848 F.Supp. 303, 313 (D.N.H.1994) (holding that CAPTA does not confer a right subject to private enforcement under § 1983 to have the state's child protection laws "effectively" enforced); *Baby Neal v. Casey,* 821 F.Supp. 320, 329 (E.D.Pa.1993) (holding that CAPTA "does not create enforceable rights under 42 U.S.C. § 1983"); *Jensen v. Conrad,* 570 F.Supp. 91, 112–13 (D.S.C.1983) (holding that CAPTA does not give plaintiff a "right to be unqualifiedly protected from, or free from, abuse within the contemplation of § 1983"), *aff'd,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). In the face of this support for the conclusion that 42 U.S.C. § 5106a(b)(2) does not confer a private right enforceable under 42 U.S.C. § 1983, Plaintiffs' reliance on the reasoning of *Marisol A. v. Giuliani,* 929 F.Supp. 662 (S.D.N.Y.1996), *see* Pl. Opp. at p. 39, is unconvincing. Specifically, under *Blessing,* the right to "prompt and professional investigations of allegations of abuse or neglect" and the right "to protection from those who endanger their

health and welfare" simply are too vague and amorphous as to be beyond the realm of judicial enforcement. *See Jordan,* 66 F.Supp.2d at 648, n. 6 and 649 (considering reasoning of *Marisol A.* and dismissing plaintiff's claims under § 1983 that 42 U.S.C. § 5106a(b)(2) guaranteed "the right to prompt and appropriate investigation of reports of abuse and neglect" and the right "to protection from those who endanger their health and welfare" because "CAPTA fails to mandate a particular means of investigation or state what type of actions must be taken to protect abused or neglected children," and therefore, such rights were "vague and amorphous") (citation omitted).[8]

Thus, for these reasons, Defendants' motion to dismiss is granted with respect to the Fifth Count of Plaintiffs' Complaint.

### c. *EPSDT*

Plaintiffs allege that the Early and Periodic Screening, Diagnostic and Treatment provisions of the federal Medicaid Act, specifically, 42 U.S.C. §§ 1396a and 1396d(a) and (r), require that "all Medicaid-eligible children up to the age of twenty-one receive comprehensive physical, developmental, and mental health care, if the state receives Medicaid funding." Compl. at ¶¶ 39 and 70. In this regard. Plaintiffs allege that "[a]ll foster children in New Jersey are Medicaid eligible and are entitled to receive the comprehensive health care required by the EPSDT program since New Jersey receives medicaid funding." *Id.* at ¶ 70. Plaintiffs allege that as a result of the "actions and inactions of the defendants," Plaintiffs are being denied the rights conferred upon them by the EPSDT program, including the

---

8. Moreover, that Plaintiffs may allege that Defendants are not "enforcing" state law or "operating" a statewide program with the required "provisions and procedures" to protect abused and neglected children, *see* Pl. Opp. at p. 39, is of little consequence to the result under the *Blessing* analysis. Indeed, such a claim creates greater problems for Plaintiffs; specifically, that it would violate the Eleventh Amendment for this Court to

order the State to enforce or comply with its own laws. *See Jeanine B. v. Thompson,* 967 F.Supp. 1104, 1118–19 (E.D.Wis.1997) (noting that "the 11th Amendment precludes this Court from ordering the State to properly enforce or comply with its own laws, and CAPTA cannot be interpreted in a manner that effectively overrides the State's 11th Amendment immunity in this regard") (citations omitted).

"right to receive periodic general physical health examinations administered by competent medical professionals at age-appropriate intervals determined by a panel of independent health care experts," the "right to receive periodic hearing and eye examinations, mental health examinations, dental examinations and lead blood tests, administered by competent medical professionals at age-appropriate intervals," the "right to receive any and all treatments deemed necessary by a qualified medical professional conducting any of the above-mentioned periodic health examinations." *Id.* at ¶ 408.

With respect to Plaintiffs' EPSDT claim, Defendants argue that while there is limited case law indicating that a § 1983 action may be brought "to enforce payment for specific treatments," Def. Motion at p. 27, n. 14, EPSDT "does not create an open-ended benefit," and to the extent Plaintiffs have failed to "identify the treatment plaintiffs allege they were denied," Plaintiffs' EPSDT claim should be dismissed. *Id.* at p. 27. Plaintiffs counter the Defendants have conceded that there is "extensive case law" recognizing that EPSDT creates "enforceable rights" and that Defendants incorrectly assert that Plaintiffs have failed to allege their EPSDT claim with specificity. *See* Pl.Opp. at pp. 44–45.[9] Defendants respond that Plaintiffs "simply allege a list of ailments without reference to which are treated under [EPSDT] and without even saying that treatment was sought and denied." Def. Reply at p. 12, n. 6.

In opposition to Defendants' motion to dismiss, Plaintiffs point to 42 U.S.C. § 1396d(r) in support of their alleged right under EPSDT enforceable pursuant to § 1983. *See* Pl.Opp. at p. 44 (citing 42 U.S.C. §§ 1396d(r)(1)(A) and (B), 1396d(r)(2), 1396d(r)(3), 1396d(r)(4), and 1396d(r)(5)). Importantly, 1396d(r) defines "early and periodic screening, diagnostic, and treatment services" for purposes of, *inter alia,* 42 U.S.C. § 1396 which makes available federal appropriations for "payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance" and for purposes of 42 U.S.C. § 1396a which delineates, in painstaking detail, what constitutes such "State plans for medical assistance." *See* 42 U.S.C. §§ 1396a(a)–(z). Thus, if anything provides support for the rights Plaintiffs seek to assert under EPSDT pursuant to § 1983, it certainly is not 42 U.S.C. § 1396d(r) alone, as this only defines a term used in a much larger and more complicated statutory scheme, but that provision taken in conjunction with, at a minimum, 42 U.S.C. §§ 1396 and 1396a. *See B.H. v. Johnson,* 715 F.Supp. 1387, 1401 (N.D.Ill.1989) (noting "[i]t would be strange for Congress to create enforceable rights in the definitional section of a statute").[10]

As has been expressed earlier, this Court cannot dispute that the individual examples offered by Plaintiffs are tragic. However, no matter how tragic, these unfortunate circumstances do not give rise to the § 1983 rights alleged by Plaintiffs, especially when the EPSDT provisions cited by Plaintiffs are examined under the *Blessing* test. For example, the "right to receive any and all treatments deemed necessary by a qualified medical professional conducting any of the ... periodic health examinations, [as defined in 42

9. In support of their EPSDT claim, Plaintiffs also offer "specific allegations [where] medical screening services and treatment have been systematically denied not only to specific children, but also to the putative class as a whole." Pl.Opp. at pp. 44–45. However, nowhere do Plaintiffs allege that they sought to enforce, but were denied, payment for specific treatments.

10. In their Complaint, Plaintiffs do point to §§ 1396a and 1396d(a). *See* Compl. at ¶ 39b. As noted, § 1396a delineates what must be provided for in a "State plan for medical assistance." § 1396d(a), like § 1396d(r), is part of the definitional section for § 1396. Specifically, § 1396d(a) defines the term "medical assistance."

U.S.C. § 1396d(r),]" Compl. at ¶ 408, is not unlike the claim examined in *Blessing* wherein the plaintiffs argued that Title IV–D of the Social Security Act granted them "individual rights to all mandated services delivered in substantial compliance with Title IV–D and its implementing regulations." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353. As was the holding in *Blessing,* the "right to receive any and all treatments deemed necessary" is too vague and amorphous to lend itself to proper judicial administration. Indeed, to allow such a right would improperly require this Court to oversee the entire State plan developed pursuant to 42 U.S.C. § 1396a. *See Blessing,* 520 U.S. at 341, 117 S.Ct. 1353. Moreover, as was the holding in *Blessing,* enforcement of such undefined rights like the "right to receive periodic general physical health examinations administered by competent medical professionals at age-appropriate intervals," as well as the "right to receive periodic hearing and eye examinations, mental health examinations, dental examinations and lead blood tests, administered by competent medical professionals at age-appropriate intervals," would certainly strain the judicial competence.[11] Thus, under the *Blessing* framework, EPSDT does not confer the § 1983 rights alleged by Plaintiffs.

Moreover, the Supreme Court's examination of the language and structure of Title IV–D of the Social Security Act also compels a determination that EPSDT does not confer the § 1983 rights alleged by Plaintiffs. Importantly, "[i]f the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under [§ 1396a(b) ], finds—that in the administration of the plan there is a failure to comply substantially with any such provision [of § 1396a(a) ]; the Secretary shall notify such State agency that further payments will not be made to the State . . ., until the Secretary is satisfied that there will no longer be any such failure to comply." 42 U.S.C. § 1396c. Thus, EPSDT specifically provides that the federal government may revoke the funding provided to the states pursuant to 42 U.S.C. § 1396. However, the Secretary cannot compel New Jersey, or any other state, to act in a certain way. Thus, as was the finding in *Blessing,* the federal funding scheme established in EPSDT does not give rise to an individual right enforceable pursuant to § 1983. *See Blessing,* 520 U.S. at 344, 117 S.Ct. 1353 (noting that "even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; *she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals.* In short, the substantial compliance standard is designed simply to trigger penalty provisions that . . . reduce the State's AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights.") (emphasis added).

Therefore, for the foregoing reasons, Defendants' motion to dismiss is granted with respect to the Eighth Count of Plaintiffs' Complaint.

### d. *ADA and RHA*

■ Plaintiffs also allege that the ADA and RHA "require that programs such as child welfare and foster care be administered to enable children with handicaps or disabilities to participate fully in, and re-

---

**11.** In an apparent effort to avoid the argument that the rights Plaintiffs seek to enforce under EPSDT are standardless, Plaintiffs offer that the "age-appropriate intervals" sought may be "determined by a panel of independent health care experts." Compl. at ¶ 408. However, as noted above, this Court does not sit to oversee every aspect of the State plans as enunciated in 42 U.S.C. § 1396a, including supplanting the State's determination with respect to "reasonable standards of medical and dental practice" reached "after consultation with recognized medical and dental organizations involved in child health care." 42 U.S.C. § 1396d(r).

ceive all the benefits of, the programs and to be placed in the least restrictive setting appropriate." Compl. at ¶ 72. In this regard, Plaintiffs argue that as a result of Defendants' "actions and inactions" Plaintiffs are being deprived of rights conferred upon them by the ADA and RHA including, but not limited to, the "right to participate fully and receive the benefits of the state child welfare and foster care programs; to be placed in the least restrictive placement; and to receive any and all services necessary for them to participate fully in the state foster care program despite their handicaps or disabilities." *Id.* at ¶ 409.

With respect to these allegations, Defendants argue that Plaintiffs' Complaint seeks "additional programs and services and therefore fails to state a claim under the ADA or RHA." Def. Motion at p. 28. In this regard, Defendants argue that the provisions of the ADA and RHA applicable to public entities, Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* and Section 504 of the RHA, 29 U.S.C. § 794, do not require Defendants "to provide or develop special services or programs to assist the disabled." *Id.* at pp. 28 and 30.[12] Specifically, Defendants assert that Plaintiffs cannot claim a violation of the ADA or RHA for Defendants' failure to provide "any and all services necessary [for Plaintiffs] to participate fully in the foster care in the state foster care program," Compl. at ¶ 409, because such a claim does not allege that any Plaintiff "has been excluded from any program because of his or her disability," as is required under either of the applicable sections of the ADA or RHA. Def. Motion at p. 31. Plaintiffs respond that the Complaint "[f]airly construed, ... alleges that defendants are failing to accommodate the needs of disabled children by placing them

in foster homes and the either not providing them with services or providing services that are less effective than those provided to non-disabled children." Pl. Opp. at p. 48. For example, Plaintiff allege that Defendants "are unnecessarily segregating disabled children by maintaining them in settings that are more restrictive than is necessary to meet their needs, or by sending them out of state" and "fail to challenge the rejection of disabled children by residential treatment centers, thereby protracting their confinement and segregation." *Id.* Defendants reply that Plaintiffs' response demonstrates the inappropriateness of Plaintiffs' ADA and RHA claims. Specifically, Defendants argue that "Plaintiffs themselves characterize their claim as one that '[f]airly construed, ... alleges that defendants ... are not providing services' which they contend would ameliorate these unidentified disabilities." Def. Reply at p. 11.

While not so limited as Defendants would suggest, Plaintiffs' argument with respect to their claims under the ADA and RHA is a novel approach to say the very least. Specifically, while the ADA defines discrimination as encompassing not only adverse actions motivated by prejudice and fear of disabilities, but also failing to make reasonable accommodations of disabilities, *see Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir.1999) (citing 42 U.S.C. §§ 12112(a), (b)(5)(A)), there is a clear lack of support for the type of accommodation sought here. Specifically, Plaintiffs seek "to receive any and all services necessary for them to participate fully in the state foster care program despite their handicaps or disabilities." Compl. at ¶ 409. Plaintiffs are not simply seeking access to the foster care system, but in-

---

**12.** In this regard, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RHA similarly provides

that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

stead, are seeking "to participate fully" in New Jersey's foster care system. *Id.* To highlight Plaintiffs' inability "to participate fully" in the foster care system, Plaintiffs offer the following examples:

> Dennis and Denise M. "have learning disabilities and severe emotional and behavioral problems." The "current foster parent is unable to meet their needs." While "DYFS has recently acknowledged that the children should be in a therapeutic foster home that could provide specialized care, DYFS has failed to secure such a home for them or to otherwise provide adequately for the children's special needs."

> Marco and Juan C. "suffer from neurological and behavioral problems." Marco's foster parents "have no training in caring for children with [his] neurological and behavioral problems."

> Ricky, Daniel, and Thomas M. are disabled and have severe special needs. Ricky "is hearing impaired," has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Post–Traumatic Stress Disorder (PTSD), and Intermittent Explosive Disorder. Daniel has a spastic bladder, sleep apnea, epilepsy with a seizure disorder, is neurologically impaired, has been diagnosed with severe APHD [sic], PTSD, is learning disabled and developmentally delayed. Thomas is vision and hearing impaired, is being tested for a seizure disorder, and is learning disabled and developmentally delayed. Defendants have repeatedly rejected pleas for services by their mother, Ms. M.

> "Disabled children are placed in regular foster homes with foster parents lacking any specialized training as to how to care for them, and suffer harm as a result. Such disabled children receive lower quality foster care services than is provided to non-disabled foster children in similar placements."

Pl.Opp. at pp. 47–48 (citations to Compl. omitted).

However, Plaintiffs' view of what is actionable under 42 U.S.C. § 1983 for alleged violations of the ADA and RHA is not sustainable. For example, if, in order "to participate fully" in the foster care system, Plaintiffs seek special services or affirmative assistance to the disabled, this is not actionable under the ADA or RHA. *See, e.g. Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 640, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (noting that " 'neither the language, purpose, nor history of [the RHA] reveals an intent to impose an affirmative obligation' on recipients of federal financial assistance"). Thus, that children with learning disabilities or neurological and behavior problems may be placed in "regular foster homes," does not support a cause of action under the ADA or RHA, especially where Plaintiffs have not alleged that they are treated any differently than similarly situated non-disabled foster children. *See Doe v. Pfrommer,* 148 F.3d 73, 83 (2d Cir.1998) (noting that "the central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied"). Moreover, if, in order "to participate fully" in the foster care system, Plaintiffs are challenging "the substance of services provided," this is not actionable under the ADA or RHA. *See Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir.1999) (noting that appellees' challenge to "the substance of the services provided" not actionable under the ADA or RHA, as compared to "illegal discrimination against the disabled"). Thus, that foster parents of children with neurological and behavioral problems "have no training in caring for children with neurological and behavioral problems," does not support a cause of action under the ADA or RHA, especially where Plaintiffs have not alleged that parents of non-disabled children are provided with training for caring for their children, and therefore, are treated differently than foster parents of children with neurological or behavioral problems or learning disabilities, or any other disabilities for that mat-

ter. *Id.* (noting that a state "cannot unlawfully discriminate against [the disabled] by denying a benefit it provides to no one"). Finally, Plaintiffs have not alleged that the accommodations sought exist. Thus, that "DYFS has recently acknowledged that the children should be in a therapeutic foster home that could provide specialized care, [but] failed to secure such a home for them or to otherwise provide adequately for the children's special needs" or "Defendants have repeatedly rejected pleas for services" by foster parents, does not state a cause of action under the ADA or RHA, especially where Plaintiffs have not alleged that such services exist or are available and were not offered because of the Plaintiffs' disabilities. *See P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir.1990) (noting that "[n]o proof has been offered to suggest that more suitable accommodations were available and not offered to [plaintiff]").

For these reasons, Defendants' motion to dismiss for failure to state a claim is granted with respect to the Ninth Count of Plaintiffs' Complaint.

### 2. Plaintiffs' Federal Common Law Claim

■ In the Sixth Count of Plaintiffs' Complaint, Plaintiffs assert "a separate cause of action for breach of the 'State Plans' agreed to by New Jersey pursuant to the Adoption Assistance Act and CAPTA under established federal common law principles governing third party beneficiary rights." Pl.Opp. at p. 49 (citations omitted). Specifically, Plaintiffs allege that "[a]s a result of the foregoing actions and inactions of the defendants, the plaintiff children, as third-party beneficiaries to the Adoption Assistance Act and CAPTA contractual agreements entered into between the defendant[s] and Congress, are being denied their rights under the federal common law to the services and benefits that New Jersey is contractually obligated

to provide to them under these federal funding statutes." Compl. at ¶ 406. Defendants argue that Plaintiffs' federal common law claim is faulty in two respects: 1) that a funding statute constitutes a contract; and 2) Plaintiffs are third-party beneficiaries who may enforce such a contract. *See* Def. Motion at p. 34. Plaintiffs counter that any determination of Plaintiffs' rights as third-party beneficiaries under the Adoption Assistance Act and/or CAPTA constitutes a "mixed question of law and fact," and therefore, cannot be addressed on Defendants' motion to dismiss. *See* Pl.Opp. at pp. 49–50 (citing *Thomas v. New York City*, 814 F.Supp. 1139, 1152 (S.D.N.Y.1993)).[13] Defendants respond that the Court should never get to the "mixed question" of Plaintiffs' rights as third-party beneficiaries because Plaintiffs' Sixth Count is not cognizable as a matter of law. *See* Def. Reply at p. 12. Specifically, Defendants argue that there is no precedent offered by Plaintiffs for the assertion that a " 'State plan' formulated under AACWA and CAPTA and approved by the Secretary of Health and Human Services pursuant to those statutes somehow constitutes a contract." *Id.*

Defendants are correct. First, Plaintiffs have failed to offer any support for the proposition that New Jersey's State plans formulated under the Adoption Assistance Act or CAPTA and approved by the Secretary of Health and Human Services pursuant to these statutes constitute a contract. Second, Plaintiffs have not offered support for their contention that New Jersey may be sued in contract for an alleged failure to appropriately carry out a State plan drafted under the Adoption Assistance Act or CAPTA. For example, Plaintiffs cite *Davis v. Philadelphia Housing Authority*, 121 F.3d 92, 100 (3d Cir.1997) for the proposition that Plaintiffs' claims for breach of the State plans agreed to by New Jersey pursuant to the Adoption As-

---

13. *Thomas* was decided in the Eastern District of New York, not the Southern District as cited by Plaintiffs.

sistance Act and CAPTA may be brought against the State under established federal common law principles governing third party beneficiary rights. *See* Pl.Opp. at p. 49. However, the Third Circuit in *Davis* clearly noted the limited scope of its holding:

> At the outset, we note the *limited scope of the issue we are asked to review;* namely, whether the district court erred by dismissing the Davis's claims for lack of standing. *This issue is analytically distinct from the related question of whether the Lead Act provides Section 8 participants or their successor. tenants with either an express or implied cause of action against the Housing Authority for an alleged breach of its duties to inspect for lead-based hazards and to ensure removal of such hazards in apartment units* which are, or at some time were, part of the Section 8 program. [W]e [have] *explicitly noted the distinction between a dismissal of a claim for lack of standing based upon a failure to satisfy the zone of interest test and a dismissal for failure to state a cause of action.*

*Davis,* 121 F.3d at 94 (citations omitted) (emphasis added). Plaintiffs also cite *Thomas v. New York City,* 814 F.Supp. 1139, 1152 (E.D.N.Y.1993) as an example of a situation where the Eastern District of New York denied "defendants' motion to dismiss plaintiffs' claim as third party beneficiaries to contracts between city and foster care contractors under Fed.R.Civ.P. 12(b)(6) or (c), because claim was 'mixed question of law and fact' and contracts were not before the Court." *See* Pl.Opp. at pp. 49–50. However, given the *Suter* holding, the *Thomas* court clearly indicated that it did not address any claim by the plaintiffs as third party beneficiaries, or

otherwise, under the Adoption Assistance Act. *See Thomas,* 814 F.Supp. at 1152 (noting "[t]he City defendants next argue, and plaintiffs concede, that there is no private right of action under the Federal Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 670 *et seq.*") (citing *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)). Thus, neither *Davis,* nor *Thomas,* stand for the proposition that Plaintiffs may sue New Jersey in contract for an alleged failure to appropriately carry out a State plan drafted under the Adoption Assistance Act or CAPTA. The other cases cited by Plaintiffs also fail to support Plaintiffs contentions with respect to their third-party beneficiary claim. For example, Plaintiffs cite *D'Amato v. Wisconsin Gas Company,* 760 F.2d 1474, 1479 (7th Cir.1985) for the proposition that a "claim as third party beneficiary to contract entered into pursuant to federal statute is governed by federal common law." Pl.Opp. at p. 49. However, *D'Amato,* while noting that "[t]his case concededly implicates federal common law rather than state common law, because rights allegedly arising out of a federal statute are at issue," *D'Amato,* 760 F.2d at 1478–79, also found that not only could the plaintiff not enforce a private right under Section 503 of the Rehabilitation Act, the plaintiff could not circumvent this conclusion by asserting a common law cause of action as a third-party beneficiary. *Id.* (holding that "plaintiff seeks to avoid the well-settled rule ... that no private right of action arises under Section 503"). Therefore, given that Plaintiffs cannot state a § 1983 cause of action upon which relief may be granted under the Adoption Assistance Act or CAPTA, Plaintiffs cannot circumvent the Court's holding by asserting a third-party beneficiary claim.[14]

---

**14.** Plaintiffs also cite *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 248 (S.D.N.Y.1989), and *Concerned Tenants of Father Panik Village v. Pierce,* 685 F.Supp. 316, 323 (D.Conn.1988). Both cases, however, are limited by the facts which supported their holdings and will not be extended to support

Plaintiffs' contention that State plans formulated by New Jersey constitute a contract. Indeed, *McNeill* specifically noted that "[i]n finding that plaintiffs are intended third-party beneficiaries, the Court does not open the door to all beneficiaries of government contracts to attempt to enforce such contracts.

For these reasons, Defendants' motion to dismiss for failure to state a claim is granted with respect to the Sixth Count of Plaintiffs' Complaint.

### 3. Plaintiffs' Federal Constitutional Claims

Plaintiffs also allege three constitutional causes of action. Specifically, Plaintiffs allege that they "are being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution." *See* Compl. at First Count. Plaintiffs also allege that they "are being deprived of state created liberty or property rights without due process of law" in violation of the Fourteenth Amendment to the United States Constitution. *Id.* at Second Count. Finally, Plaintiffs allege that they "are being deprived of their right conferred upon them by the First and Ninth Amendments to the United States Constitution not to be deprived of a family relationship absent compelling reasons." *Id.* at Third Count.

#### a. *Substantive Due Process*

Plaintiffs allege that the "Fourteenth Amendment of the United States Constitution guarantees to each child in state custody the substantive due process right to be free from harm and the right to conditions of custody reasonably related to the purpose of custody." Compl. at ¶ 57. Specifically, Plaintiffs allege that the "right to be free from harm encompasses the right to treatment in accordance with reasonable professional standards, and the right to the services necessary to prevent children from deteriorating physically, psychologically or otherwise while in state care, including but not limited to safe, secure foster care placements, appropriate monitoring and supervision, case planning and management, permanency planning and medical, psychiatric, psychological and educational services." *Id.* In this regard,

Plaintiffs allege that the "actions and inactions of the defendants are inconsistent with the exercise of reasonable professional judgment and also amount to a pattern, practice and custom of deliberate indifference to plaintiff children's constitutional rights." *Id.* at ¶ 401. Consequently, Plaintiffs allege that they "are being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution." *Id.* Specifically, Plaintiffs allege the deprivation of the following rights: i) right to protection from harm; ii) right not to be harmed, "physically, emotionally, developmentally, or otherwise—while in state custody;" iii) right not to remain in state custody "unnecessarily;" iv) right to be housed in the "least restrictive, most appropriate and family-like placement" while in state custody; v) right to treatment; vi) right to treatment related to the cause of their confinement; and vii) right to receive care, treatment and services consistent with "competent professional judgment." *Id.*

With respect to Plaintiffs' substantive due process claim, Defendants first argue that only those children in state custody can assert a substantive due process constitutional claim. *See* Def. Motion at p. 42 (citations omitted). Thus, Defendants assert that the substantive due process claims by Ryan, Christopher, and Melissa H. and Ricky, Daniel, and Thomas M. must be dismissed because these Plaintiffs "allege that they are in the custody of their families." *Id.* In this regard, Defendants note that "over 40,000 of the alleged 50,000 [children in the putative class] fall into this category of non-custodial cases," and therefore, any such substantive due process claim on behalf of this group must also be dismissed. *Id.* (citing Compl. at ¶ 36 (noting that "approximately 9,250 children [are] in the custody of DYFS")).[15]

---

This case is limited to the facts at hand." *McNeill,* 719 F.Supp. at 249.

**15.** With respect to the 9,250 children in state custody, Defendants also argue that a distinction must be drawn between those children voluntarily placed in foster care and those

Defendants next argue that Plaintiffs are merely trying to bootstrap state statutory provisions onto the Constitution and the Constitution does not guarantee the broad services demanded by Plaintiffs. *Id.* at p. 42. Plaintiffs respond first that Defendants concede that Plaintiffs who are in state custody have properly alleged substantive due process violations. *See* Pl. Opp. at p. 6. Plaintiffs next argue that the non-custodial Plaintiffs have stated a § 1983 cause of action under the "state-created danger doctrine." *Id.* at pp. 6–7 (citations omitted). Finally, with respect to the number of substantive due process rights asserted by Plaintiffs, Plaintiffs argue that "[t]he exact parameters of plaintiffs' substantive due process rights will be developed at trial," but "[t]he Complaint contains specific allegations that plaintiff children who are in the state's custody have been harmed by the defendants' failure to exercise reasonable professional judgment and their pattern and practice of deliberate indifference to plaintiffs' needs." *Id.* at p. 8.[16] Defendants reply that "none of the allegations by the non-custodial plaintiffs suggests a state-created danger," and therefore, the substantive due process claims of Plaintiffs like Ryan, Christopher, and Melissa H. and Ricky, Daniel, and Thomas M. must be dismissed. *See* Def. Reply at p. 13. Further, with respect to the remaining Plaintiffs, Defendants argue that Plaintiffs are incorrect in asserting that "[t]he exact parameters of plaintiffs' substantive due process rights will be developed at trial," because the parameters of such rights are a matter of law, not fact to be determined at trial, and as a matter of law, Plaintiffs' substantive due process rights are rather limited, as compared to

the "laundry list of rights" asserted by Plaintiffs. *Id.*

Initially, as noted, Plaintiffs begin their discussion of their substantive due process claim by asserting that the Fourteenth Amendment "guarantees to each child in state custody the . . . right to be free from harm and the right to conditions of custody reasonable related to the purpose of custody." Compl. at ¶ 57. However, later in the Complaint, Plaintiffs do not draw as clear a distinction between custodial and non-custodial children with respect to Plaintiffs' substantive due process claim. *See* Compl. at ¶ 401. Any analysis of Plaintiffs' substantive due process claim must begin by drawing a clear distinction between custodial and non-custodial children. *See DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (noting that "Estelle–Youngberg" line of cases had "no applicability in the present case" because plaintiffs "concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor" and noting "[t]hat the State once took temporary custody of Joshua does not alter the analysis"). Thus, Plaintiffs' substantive due process claim will be analyzed in light of this distinction.

### i. non-custodial children

◼ With respect to Plaintiffs' substantive due process claims on behalf of the over 40,000 non-custodial children, Plaintiffs argue that these children have the "right to be protected from harm when the state places them in a situation that the state knows to be dangerous." Pl.Opp. at pp. 7–8 (citations omitted). While on its

---

placed involuntarily. *See* Def. Motion at p. 42, n. 19 (citations omitted). However, Defendants argue that this distinction cannot be drawn based upon the face of Plaintiffs' Complaint, and therefore, "[s]hould any of plaintiffs' substantive due process claims survive, defendants will address this issue at a later date when the record is more fully developed." *Id.*

**16.** With respect to these allegations regarding Defendants' failure to exercise reasonable professional judgment, Plaintiffs argue that this standard is fact-sensitive, and therefore, cannot be determined on Defendants' motion to dismiss. *See* Pl.Opp. at p. 10.

face, such a claim may have some appeal because of the tragic circumstances alleged by Plaintiffs, a closer examination of the "state-created danger doctrine" reveals that what is required is something much more than being "aware of the dangers that [non-custodial children] face[ ] in the free world." *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1373 (3d Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) (citing *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998). Instead, what is required is that the state "affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it." *Id.* (citation omitted). Indeed, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *Id.* at 1374. Thus, there must be a "level of intermingling of state conduct with private violence" in order to support liability under the state-created danger doctrine for the harm alleged by Plaintiffs to non-custodial children. *Id.* at 1375.

■ In support of their claim that Defendants violated a constitutional duty by creating or exacerbating a danger to non-custodial children, Plaintiffs offer the following example:

> Dennis M. and Denise R. were placed by defendants with their grandparents even though the grandparents were mentally "low functioning" and "incapable of protecting" the children. The defendants did not remove the children from that home or seek formal custody until two years later, when they finally concluded the children were unsafe, poorly supervised and being neglected. Dennis and Denise "remain seriously emotionally disturbed due to the Division's failure to protect them."

Pl.Opp. at p. 9 (citations to Compl. omitted). However, such alleged nonfeasance on Defendants' part is not actionable under the state-created danger doctrine. *See D.R.*, 972 F.2d at 1376 (holding that show-ing of nonfeasance does "not rise to the level of a constitutional violation"). Moreover, no matter how tragic the circumstances as alleged, or that children may be involved, *see* Pl.Opp. at pp. 6–7 (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and arguing that "even incarcerated criminals are entitled to protection against deliberate indifference to their medical needs"), this does not suffice to show that the Defendants affirmatively "create[d][P]laintiffs' peril, increase[d] their risks of harm, or act[ed] to render them more vulnerable." *See D.R.*, 972 F.2d at 1374 (holding that "[a]lthough we find this to be . . . a tragedy," the facts did not support liability under state-created danger doctrine). Finally, to the extent Plaintiffs may argue that Defendants increased the risk of harm to non-custodial children by failing to comply with a duty imposed by state law, such a claim is not cognizable pursuant to the Due Process Clause. *Id.* at 1375 (holding that "a violation of a state law duty, by itself, is insufficient to state a § 1983 claim"). For these reasons, to the extent Plaintiffs' seek to assert a substantive due process claim on behalf of non-custodial children in the First Count of Plaintiffs' Complaint, Defendants' motion to dismiss is granted.

### ii. *custodial children*

■ Initially, with respect to the approximately 9,250 children in state custody, a distinction must be drawn between those children involuntarily within state custody and those voluntarily within state custody, if such children exist. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998 (holding that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against

harms by other means"). *See also Milburn v. Anne Arundel County Dep't of Social Serv.*, 871 F.2d 474, 476 (4th Cir.) (noting that "[t]he State of Maryland by the affirmative exercise of its power had not restrained the plaintiff's liberty; he was voluntarily placed in the foster home by his natural parents"), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989). It is not clear from the face of Plaintiffs' Complaint whether there are children in state custody voluntarily. However, Defendants' motion to dismiss is granted with respect to the First Count of Plaintiffs' Complaint to the extent Plaintiffs' allege a substantive due process claim on behalf of children voluntarily in state custody.

With respect to those children involuntarily in state custody, although *DeShaney* "express[ed] no view on the validity of [the] analogy" that "[h]ad the State by the affirmative exercise of its power removed [plaintiff] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect," *DeShaney*, 489 U.S. at 201, n. 9, 109 S.Ct. 998, other courts have recognized that the analogy is appropriate. *See, e.g. Taylor v. Ledbetter*, 818 F.2d 791, 796 (11th Cir.1987) (holding that the "such similarities exist between a prisoner's situation and the situation of a minor forced into a foster home that we are justified in holding that the situations are sufficiently analogous to support a section 1983 action"), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989). Indeed, courts have recognized the right of children "who have been involuntarily placed in the custody of [the state] may state a claim for violation of their substantive due process rights based upon their right to freedom from harm under the fourteenth amendment of the United States Constitution." *Baby Neal v. Casey*, 821 F.Supp. 320, 335 (E.D.Pa.1993). However, this right to freedom from harm under the Due Process Clause of the Fourteenth Amendment does not entitle Plaintiffs to an "optimal level of care and treatment." *B.H. v. Johnson*, 715 F.Supp. 1387, 1397–98 (N.D.Ill.1989). Moreover, this right to freedom from harm is not without boundaries. Specifically, under the Fourteenth Amendment, the State is required to provide to individuals within state custody their "basic human needs," such as "food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998 (citations omitted). Thus, Plaintiffs do not have a substantive due process right to "not remain in state custody unnecessarily," nor do Plaintiffs have a substantive due process right "to be housed in the least restrictive, most appropriate and family-like placement while in state custody." *See Baby Neal*, 821 F.Supp. at 335 (dismissing plaintiffs' claims for "permanent placements or placement in preadoptive homes pending their adoption"). Therefore, Defendants' motion to dismiss is granted with respect to the First Count of Plaintiffs' Complaint to the extent Plaintiffs assert a substantive due process claim on behalf of children involuntarily in state custody to "not remain in state custody unnecessarily" or "to be housed in the least restrictive, most appropriate and family-like placement while in state custody." *See* Compl. at ¶ 401. With respect to Plaintiffs' remaining substantive due process claims in the First Count of Plaintiffs' Complaint on behalf of children involuntarily in state custody, specifically, Plaintiffs' substantive due process claim based upon the right not to be harmed, which includes the right to reasonable protection from harm and Plaintiffs' substantive due process claim to the right to treatment, which includes the right to receive care, treatment and services consistent with competent professional judgment, Defendants' motion to dismiss is denied.[17]

---

**17.** Of course, as to what exactly these due process rights encompass may be the subject

Therefore, Defendants' motion to dismiss is granted in part and denied in part as noted herein with respect to the First Count of Plaintiffs' Complaint.

### b. *Procedural Due Process*

■ Plaintiffs also allege that the "Fourteenth Amendment further guarantees the right not to be deprived of state-created liberty or property interests [arising from Title Nine and Title Thirty of New Jersey's statutes] without due process of law." Compl. at ¶ 58. Specifically, Plaintiffs allege that Title Nine and Title Thirty of the New Jersey statutory code confer certain benefits upon them, and as such, may not be deprived without due process of law, in that the said statutory schemes require Defendants to:

operate, on a twenty-four daily basis, a system for receiving allegations of child abuse or neglect; initiate investigations into screened reports of child abuse and neglect within the mandated time frame (either immediately, within twenty-four hours, seventy-two hours or up to ten days, depending on the nature of the report); conduct a full investigation, including face-to-face interview with, among others, the child, the parent or caretaker responsible for the child at the time of the incident, any other child who resides in the home and each alleged perpetrator, and obtain information from collateral sources who might have relevant information regarding the child or family; forward all reports of abuse and neglect to the central registry within seventy-two hours; and unless good cause is shown, make a final determination within forty-five days as to whether the allegation is substantiated, not substantiated, or unfounded;

take immediate steps, upon receipt of a report of abuse or neglect, necessary to ensure the safety of the child; initiate a judicial proceeding by the next business day if a child determined to be in imminent danger is taken into custody;

provide an immediate medical examination to each child taken into custody pursuant to an emergency removal or temporary removal with consent;

begin a search for relatives willing and able to care for a child within thirty days of taking the child into custody, and make their best effort to place the child who has been removed with a relative;

provide each child determined to be eligible for pre-placement services, or services while in foster care, with a comprehensive assessment and case plan that includes all required elements within thirty days from the date the child enters placement or forty-five days from the date of referral, and a reassessment and case plan review with all required elements within six months from the completion of the initial case and assessment plans and [sic] every six months thereafter;

make reasonable efforts, in the circumstances articulated by statute, prior to placing a child outside of the home to preserve the family in order to prevent the need for removing the child from the home, and make reasonable efforts after placement to make it possible for the child to safely return home;

provide each child placed outside of the home with a placement plan; provide each child who is placed outside of the home, returned home, and then once again removed, with a repeated placement plan within thirty days of the repeated placement;

provide each child placed outside of the home with a visitation plan, and ensure than a child placed outside of the home is accorded visitation with parents and siblings, and contact with the caseworker in accordance with visitation and case plans;

---

of future motion practice. For example, the Court questions the extent to which Plaintiffs may claim a substantive due process right to "treatment related to the cause of their confinement" within the right to medical treatment. Compl. at ¶ 401. However, issues such as this may be visited in future.

identify and provide each child and family with services in accordance with the child's case plan, including, but not limited to, case planning and case management services, casework contacts, clothing allowances, day care services, homemaker services, emergency maintenance services, clinical services, family preservation services, transportation services, shelter care, and maintenance services;

ensure that the type or level of foster care placement in which a child resides is the least restrictive and appropriate to the individualized needs of the child; ensure that a child placed outside of the home receives services of a high quality that are designed to maintain and advance the child's mental and physical well being, an educational program that will maximize the child's potential, and safe and appropriate food, clothing and medical care;

adequately investigate potential foster homes in the manner required by law before approving foster parents and placing children in their homes, and appropriately evaluate and review the foster homes annually;

ensure that all foster children achieve permanency either by being returned to their families at the earliest date on which it is safe to do so, or, when reunification is not appropriate, by petitioning for long-term foster care or terminating parental rights and arranging for adoption within the time frames established by law;

provide each child with a permanency hearing within 30 days after a determination that reasonable efforts to reunify the family are not required or no later than 12 months after the child has entered placement in all other cases;

provide children placed in foster care with annual judicial reviews as well as annual administrative reviews; provide children who have been freed for adoption and who are in a pre-adoptive home when no adoption petition has been filed

with an administrative review every six months; and

provide each child 16 years of age or older with a written plan, reviewed annually, to prepare the youth for self-sufficient living.

Compl. at ¶ 60a–p. In this regard, Plaintiffs allege that the "actions and inactions of defendants are inconsistent with the exercise of reasonable professional judgment and also amount to a pattern, practice and custom of deliberate indifference to plaintiff children's procedural due process rights." *Id.* at ¶ 402. Consequently, Plaintiffs allege that they are being deprived of the following liberty or property rights created by state statute without due process of law: i) the right to have allegations of child abuse or neglect investigated within specified time frames and in a specified manner; ii) the right of each child who is determined to be eligible for pre-placement services or who is in foster care to be provided with a service assessment and a service plan within specified time frames and in a specified manner; iii) the right of each child and her family to receive services in accordance with the child's service assessment and plan, including case contact, case planning and case management services; iv) the right of children in foster care to reside in a placement appropriate to her particular needs and to receive necessary supportive and rehabilitative services; v) the right to a visitation plan and visits with family members in accordance with that plan; vi) the right to have all potential foster homes, foster parents and other placements investigated and monitored in a specified manner before any children are placed in them; vii) the right to have those homes and placements supervised, visited and inspected periodically in a specified manner; viii) the right of all foster children to either be returned to their families or freed for adoption and adopted so as not to languish in foster care; and ix) the right to have their cases judicially and administratively reviewed at

specified intervals and in specified manners. *Id.*

With respect to Plaintiffs' procedural due process claim, Defendants argue that: i) Plaintiffs may not enforce New Jersey law against the State in federal court; ii) the provisions of New Jersey law in question do not create liberty or property interests such as traditionally protected under the Fourteenth Amendment; and iii) even if Plaintiffs could point to an entitlement, they have not sufficiently pled a deprivation of their rights without due process. *See* Def. Motion at p. 36. Plaintiffs respond that: i) Plaintiffs are not attempting to enforce state law, but instead, are attempting to enforce federal interests created by state law; ii) New Jersey law creates legal entitlements for children in foster care under the Fourteenth Amendment; and iii) the Complaint properly alleges systematic deprivation of procedural due process protections. *See* Pl.Opp. at pp. 13–17. Defendants reply that "[a]ssuming, without conceding, that New Jersey law creates one or more entitlements in children in foster care," Plaintiffs never set forth how these entitlements are being denied without due process of law. *See* Def. Reply at p. 13.

Initially, the due process rights alleged by Plaintiffs mirror, almost identically, the rights asserted by Plaintiffs under CAPTA and AACWA, even though such alleged rights were apparently lifted from New Jersey statutes. *See* Compl. at ¶ 60. For example, Plaintiffs allege that they are being deprived of the right, without due process of law, "to have allegations of child abuse or neglect investigated within specified time frames and in a specified manner." Compl. at ¶ 402. This mirrors the right alleged by Plaintiffs under CAPTA, "to the enforcement of laws requiring prompt and professional investigations of allegations of abuse or neglect" and the right "to protection from those who endanger their health and welfare." *Id.* at ¶ 405. Also, Plaintiffs allege that they are being deprived of the right, without due

process of law, "to be provided with a service assessment and a service plan within specified time frames and in a specified manner." *Id.* at ¶ 402. This language is nearly identical to the right alleged by Plaintiffs under AACWA to have Defendants "implement a pre-placement preventive services program designed to help children remain with their families or be returned to their families when appropriate" and the right to "timely written case plans that contain mandated elements." *Id.* at ¶ 404. Similarly, Plaintiffs further allege that they are being deprived of the right, without due process of law, "to receive services in accordance with the child's service assessment and plan, including case contact, case planning and case management services." *Id.* at ¶ 402. This right is nearly identical to the right alleged by Plaintiffs under AACWA to "the implementation and review of [timely written case plans that contain mandated elements]" and to "planning and services to secure their permanent placement at the earliest possible time." *Id.* at ¶ 404. Moreover, Plaintiffs claim that they are being deprived of the right, without due process of law, "to reside in a placement appropriate to her particular needs and to receive necessary supportive and rehabilitative services." *Id.* at ¶ 402. This is no different than the right alleged by Plaintiffs under AACWA to "placement in the least restrictive, most family-like setting." *Id.* at ¶ 404. Similarly, Plaintiffs allege that they are being deprived of the right, without due process of law, "to a visitation plan and visits with family members in accordance with that plan." *Id.* at ¶ 402. However, this is simply another way to describe the right alleged by Plaintiffs under AACWA to "placement in the least restrictive, most family-like setting." *Id.* at ¶ 404. Further, Plaintiffs allege that they are being deprived of the right, without due process of law, "to have all potential foster homes, foster parents and other placements investigated and monitored in a specified manner before any children are placed in them" and "to have those homes

and placements supervised, visited and inspected periodically in a specified manner." *Id.* at ¶ 402. This right is nearly identical to the right alleged by Plaintiffs under AACWA to "placement in foster homes or facilities that conform to nationally recommended professional standards." *Id.* at ¶ 404. Plaintiffs also allege that they are being deprived of the right, without due process of law, "to either be returned to their families or freed for adoption and adopted so as not to languish in foster care." *Id.* at ¶ 402. This is identical to the right alleged by Plaintiffs to exist under AACWA to "be freed for adoption in accordance with the time frame established by law." *Id.* at ¶ 404. Finally, Plaintiffs allege that they are being deprived of the right, without due process of law, "to have their cases judicially and administratively reviewed at specified intervals and in specified manners." *Id.* at ¶ 402. This is no different than the rights asserted by Plaintiffs under AACWA to "regular judicial and administrative reviews of their foster care placements" and "dispositional hearings within twelve months of entering custody and periodically thereafter." *Id.* at ¶ 404.

This somewhat mechanical exercise is extremely important to the analysis of Plaintiffs' procedural due process claim because in order for Plaintiffs to properly assert a claim for deprivation of a protected interest without due process of law, a protected interest must exist under either state or federal law. *See* Pl.Opp. at pp. 13–14 (citing *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) and *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) for the proposition that "[s]tatutory language creates a legitimate claim to [an] entitlement if it contains (1) particularized substantive standards or criteria to guide official discretion" and "(2) mandatory language which obligates state officials to follow the standards or criteria"). Whether Plaintiffs cite to certain state statutes in support of their procedural due process claim is of little consequence to the deter-

mination of Defendants' motion to dismiss with respect to Plaintiffs' procedural due process claim because Plaintiffs have based their procedural due process claim on interests identical to those asserted under AACWA and CAPTA. Indeed, many of the state statutes cited by Plaintiffs in support of their alleged liberty or property interests simply mirror the language of AACWA and CAPTA. *Compare, e.g.* N.J.S.A. 9:6B–4g (listing one of the "[r]ights of child placed outside the home" as the right to "placement in the least restrictive setting appropriate to the child's needs and conducive to the health and safety of the child") *with* 42 U.S.C. § 675(5)(A) (defining "case review system" as a "procedure for assuring that—each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available"). Thus, it is easy to understand why Plaintiffs' alleged procedural due process rights are identical to Plaintiffs' alleged rights enforceable pursuant to § 1983 under AACWA and CAPTA. For the numerous reasons discussed above, including that the statutory provisions relied upon by Plaintiffs are too vague and amorphous to lend themselves to judicial enforcement, it has already been determined that Plaintiffs have no enforceable rights under either AACWA or CAPTA or the regulations promulgated pursuant thereto. Because of this resolution, and because the test to determine whether rights exist under § 1983 and the test to determine whether liberty or property rights exist requiring procedural due process are so similar, *compare Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) *with Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) and *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and because the liberty and property rights alleged by Plaintiffs are nearly mirror images of the § 1983 rights alleged by Plaintiffs because such rights are based on nearly identical

statutory language, whether it be state or federal, Plaintiffs cannot establish the existence of any liberty or property interests that would entitle them to due process under the Fourteenth Amendment. Therefore, Defendants' motion to dismiss is granted with respect to the Second Count of Plaintiffs' Complaint.[18]

### c. First and Ninth Amendments

■ Plaintiffs allege that the "First and Ninth Amendments ⋅ of the United States Constitution guarantee the rights to privacy and family integrity, and grant children the right not to be removed from their families absent a showing of compelling necessity." Compl. at ¶ 59. In this regard, Plaintiffs allege that the "actions and inactions of defendants are inconsistent with the exercise of reasonable professional judgment and also amount to a pattern, practice and custom of deliberate indifference to plaintiff children's constitutional rights." Id. at ¶ 403. Specifically, Plaintiffs allege that they "are being deprived of their right conferred upon them by the First and Ninth Amendments of the United States Constitution not to deprived of a family relationship absent compelling reasons." Id.

With respect to Plaintiffs' First and Ninth Amendment claim, Defendants note that the facts alleged with regard to many of the individual Plaintiffs, specifically, Charlie and Nadine H., Dennis M. and Denise R., Ricardo O., Delores and Anna G., Christopher and Melissa H., Ricky, Daniel and Thomas M., and Barry M., fail to state a claim under Plaintiffs' First and Ninth Amendment claim for violation of the right to family integrity because "[f]ar from seeking to be reunited with their parents, many of children are seeking faster and more permanent separation from them." Def. Motion at p. 39 and 40. Fur-

ther, Defendants argue that, with respect to Jason, Jennifer and Patti W., Plaintiffs cannot assert a right to family integrity by arguing that DYFS has failed to provide services to the children's father, because "the Constitution does not guarantee the right to services necessary to reunite children with their biological parents." Def. Motion at p. 40. Moreover, Defendants argue that, with respect to Marco and Juan C., there is no "constitutional right [for siblings] to be placed together," and that there is little support for a constitutional right to "contact and visitation." Id. at p. 41 (citations omitted). Plaintiffs counter that their "fundamental right not to be deprived of a family relationship absent compelling reasons is rooted in the First Amendment's broad right of association and the Ninth Amendment's right to privacy" and "the right to family integrity extends to children who are denied visitation with siblings or parents." Pl.Opp. at pp. 17–18 (citing Aristotle P. v. Johnson, 721 F.Supp. 1002, 1007–08 (N.D.Ill.1989) and Marisol A., 929 F.Supp. at 676–77). In this regard, Plaintiffs specifically note that: i) "Marco and Juan C. allege that defendants separated them after failing to provide training to their foster parents on how to care for their 'neurological and behavioral problems[,]'" and "fail[ed] to ensure contact and visitation between them when they were placed separately;" ii) "Barry M. alleges that because DYFS did not have an appropriate residential treatment program in-state he was twice placed out of state, and remains in Georgia, far from his grandfather, who is his guardian and is the only family he has left. As a result, Barry's contact with his father is limited;" and iii) "Jason, Jennifer and Patti W. allege that DYFS is arbitrarily denying their right to family integrity by

---

18. Moreover, Plaintiffs' Prayer for Relief highlights the inappropriateness of Plaintiffs' procedural due process clause claim. Specifically, Plaintiffs request that this Court "[d]eclare ... unlawful ... defendants' ... failure to comply with Titles 9 and 30 of the New Jersey State Statutes." Compl. at p. 129.

However, such a request to enforce state law against a state in federal court raises serious Eleventh Amendment concerns which need only be mentioned at this juncture to note a further problem with Plaintiffs' procedural due process claim.

keeping them from their father's custody even though the Division has now 'placed another child—the siblings' cousin—with [their] father." *Id.* at p. 18 (citations to Compl. omitted). Defendants reply that Plaintiffs concede that "with respect to a great majority of the named plaintiffs, they can allege no impact whatsoever on any family relations." Def. Reply at p. 16. Further, Defendants argue that, with respect to Plaintiffs' argument regarding Barry M., the Complaint fails to state a claim under the First and Ninth Amendments, and even if it did, no such right to grand-parental visitation exists. *Id.* at pp. 16–17. Finally, with respect to the W. children and Marco and Juan C., Defendants reiterate their earlier arguments that there is no constitutional right to certain services, Plaintiff deem necessary, in order to preserve, or reunite, the family. *Id.* at p. 16.

Initially, a majority of individual Plaintiffs fail to state a claim for relief under Plaintiffs' theory of liability under the First and Ninth Amendments. Thus, Defendants' motion to dismiss is granted with respect to those Plaintiffs. With respect to Barry M., the Complaint fails to allege a deprivation of the "right to family integrity" on behalf of Barry M. *See* Compl. at ¶ 204.[19] Moreover, even if the Complaint alleged such a deprivation, putting aside for the moment whether a right to grand-parental visitation exists, the facts as alleged by Plaintiffs would not support such a claim. Specifically, Barry M. has not alleged that his grandfather has been denied visitation, but instead alleges that due to inadequacies in New Jersey's child wel-

fare system, "[c]ontact with his grandfather, the only family he has left, is now limited." Compl. at ¶ 202. Clearly, the case law cited by Plaintiffs in support of their claim under the First and Ninth Amendment does not establish an absolute right to family integrity. *See, e.g. Marisol A.,* 929 F.Supp. at 676 (noting that "the only courts to apply the concept of family integrity to the child welfare context have done so when children in foster care *were denied visitation with siblings and parents*") (emphasis added). Thus, given the limited breadth of holdings in this area, the so-called right to family integrity will not be extended to situations where a plaintiff, such as Barry M., alleges limited familial contact, as compared to no contact.

More importantly, with respect to the general nature of Plaintiffs' claim under the First and Ninth Amendments, as highlighted by Plaintiffs' allegations with respect to the W. children, even the case most relied upon by Plaintiffs recognizes that "[c]ourts have held . . . that plaintiffs 'do not have a constitutional right to rely on an agency to strengthen and reunite their families even if that agency has a statutory duty to do so.'" *Marisol A.,* 929 F.Supp. at 677 (rejecting plaintiffs' challenge of defendants' "general failure to provide services that function to preserve the family unit" under the First, Ninth, and Fourteenth Amendments) (citation omitted). Therefore, that Plaintiffs may allege that Defendants have failed to provide training to the foster parents of Marco and Juan C. or failed to take "steps to assist the father [of the W. children] in

**19.** Specifically, with respect to Barry M., the Complaint alleges that "defendants have violated Barry's constitutional and statutory rights by failing to protect him from harm; by failing to provide an appropriate placement that can manage Barry's psychiatric and behavioral problems; by failing to provide him with a written plan, reviewed annually, to prepare him for self-sufficient living; by failing to ensure that the services he received were designed to maintain and advance his mental and physical well-being; and by leaving him for months without adequate psychi-

atric and other care in a secure detention facility which was not the least restrictive placement to which Barry was entitled and which was inappropriate for his individual needs; failing to provide Barry, who has a disability, with the least restrictive placement and services appropriate to his particular needs; and by failing to ensure Barry receives all the benefits of the Division's child welfare program without discrimination for his handicap or disability, all of which are required by law and by reasonable professional standards."

securing housing for his children," Compl. at ¶¶ 91 and 119, does not state a cause of action under the First and Ninth Amendments. Thus, for this and the other reasons set forth above, Defendants' motion to dismiss is granted with respect to the Third Count of Plaintiffs' Complaint.

### 4. Abstention

■ Giving the foregoing, the majority of Plaintiffs' claims have been dismissed. However, the following claims remain: i) Plaintiffs' § 1983 claim on behalf of Marco and Juan C. to the extent Plaintiffs allege Defendants violated 42 U.S.C. § 671(a)(18)(B), which requires that a State plan provide that the State may not "delay or deny the placement of a child for adoption or into foster care, on the basis of race, color, or national origin of the adoptive or foster parent, or the child, involved," and 42 U.S.C. § 674(d)(3)(A), which *explicitly* provides that "[a]ny individual who is aggrieved by a violation of Section 671(a)(18) of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court;" and ii) Plaintiffs' substantive due process claim on behalf of children involuntarily in state custody not to be harmed, which includes the right to reasonable protection from harm, and the right to treatment, which includes the right to receive care, treatment and services consistent with competent professional judgment. With respect to these claims, Defendants argue that the Court should abstain from hearing Plaintiffs' claims under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See* Def. Motion at p. 46. With respect to Plaintiffs' § 1983 claim on behalf of Marco and Juan C., as *explicitly* provided for in 42 U.S.C. § 674(d)(3)(A), *Younger* abstention is not appropriate. Moreover, with respect to the remaining substantive due process claims, which are similar in nature to substantive due process claims brought of behalf on incarcerated and institutional-

ized individuals, *Younger* abstention is not appropriate.[20] Thus, at this juncture, abstention is not warranted.

### IV. *Conclusion*

It would be the height of federal judicial arrogance for this Court to supplant the efforts of New Jersey's legislative, executive, and judicial branches with respect to the everyday functioning of the child welfare system in the broad, over-reaching way suggested by Plaintiffs. A review of the relief sought by Plaintiffs confirms this sentiment. For example, Plaintiffs seek the appointment of "an expert panel with full access to defendants, their records and their personnel, to develop and oversee the implementation of a plan for reform, to ensure that defendants protect the constitutional and federal statutory rights of the plaintiff class." Compl. at pp. 129–30. However, this Court has not been named the Commissioner or Director of any state agency charged with the task of administering what, admittedly, is a troubled child welfare system. Moreover, this Court is not a cure-all elixir for the many ills of society, even if it appears to some members of the public that the state governmental units charged with curing these ills do not move fast enough. Indeed, while some may describe the situation of many of the children in New Jersey's welfare system as a "plight," this Court cannot ease this plight under many of the theories offered by Plaintiffs.

For these reasons, and for the reasons set forth throughout this Opinion, Defendants' motion to dismiss for failure to state a claim upon which relief can be granted is granted with respect to the Second, Third, Fourth, Fifth, Sixth, Eighth, and Ninth Counts of Plaintiffs' Complaint. Moreover, Defendants' motion to dismiss is granted in part and denied in part as discussed herein with respect to the First and Seventh Count of Plaintiffs' Com-

---

**20.** This does not foreclose, however, the possibility that other abstention doctrines may apply. Consideration of this issue, if appropriate, is left for the future.

plaint. An appropriate form of Order is filed herewith.

### ORDER

This matter having come before the Court on the motion of Defendants, Christine Todd Whitman, as Governor of the State of New Jersey, Michele K. Guhl, as Commissioner of the Department of Human Services, and Charles Venti, as Director of the Division of Youth and Family Services of the State of New Jersey, to dismiss Plaintiffs' complaint for failure to state a claim upon which relief can be granted; the Court having heard oral argument in this matter on November 15, 1999; for the reasons set forth in the Opinion filed in the above-captioned matter on this date; and for good cause shown;

IT IS on this 27th day of January, 2000;

ORDERED that the Defendants' motion to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted be and hereby is GRANTED with respect to the Second, Third, Fourth, Fifth, Sixth, Eighth, and Ninth Counts of Plaintiffs' Complaint; and

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted be and hereby is GRANTED IN PART and DENIED IN PART with respect to the First and Seventh Counts of Plaintiffs' Complaint; and

IT IS FURTHER ORDERED that Plaintiffs be and hereby are directed to initiate a telephonic conference call with all parties and the Court on Monday, February 7, 2000 at 11:00 a.m. for a scheduling conference to discuss the further progress of this action.